## PATTERSON et al. v. UNITED STATES.

### (Circuit Court of Appeals, Sixth Circuit.   March 13, 1915.)

### No. 2571.

1. MONOPOLIES ⬅31—CRIMINAL PROSECUTIONS—INDICTMENT—CONSTRUCTION.

An indictment alleged that during the 20 years prior to the finding thereof many concerns had been engaged in the manufacture and sale of cash registers, a list of such concerns, so far as known to the grand jurors, being therein set out; that defendants, the officers and agents of the N. Company, conspired to restrain the interstate trade and commerce carried on by such concerns other than the N. Company by unfair means, which wrongfully and irresistibly excluded others from engaging in such trade and commerce; that, intending to restrain the interstate commerce so carried on by such concerns, and compel them either to go out of business or sell their business and instrumentalities for carrying it on to the N. Company, so that it could, as in most cases it did, discontinue the business and the use of such instrumentalities, and thereby eliminate competition, they conspired to accomplish their objects by the means therein specified.   *Held*, that it was not the intention of the indictment to allege that each of the competitors of the N. Company named was in existence during the entire 20 years preceding the indictment, nor to disclose when any of them were in existence, but only to allege that during such period there was no time when one or more of such competitors were not in existence.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ⬅31.]

2. MONOPOLIES ⬅31—CRIMINAL PROSECUTIONS—INDICTMENT—CONSTRUCTION.

An indictment alleged that many concerns had been engaged in the manufacture and sale of cash registers, a list of which, so far as known, was therein set out; that certain officers and agents of the N. Company had conspired in restraint of the interstate trade and commerce carried on by the several concerns thereinbefore named other than the N. Company; and that, intending to restrict and restrain the interstate commerce so carried on by "said concerns," and to compel them to go out of business or sell their business and instrumentalities to the N. Company they had conspired to accomplish the object specified by the means therein set out, alleged to have been directed against "said concerns," "such concerns," etc.   *Held*, that the indictment did not charge a general conspiracy against all competitors, but only a conspiracy against those therein named.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ⬅31.]

3. INDICTMENT AND INFORMATION ⬅125—DUPLICITY—INDICTMENTS FOR CONSPIRACY.

Though such indictment charged only a conspiracy against the competitors therein named, and though it did not allege that all of such competitors were in existence during all of the time to which it referred, it was not duplicitous, as charging a separate conspiracy against each competitor, as its underlying thought was that there was a generic conspiracy against all competitors, which took specific direction against those named as they came into existence, and continued against them as long as they remained in existence, and therefore it charged a single conspiracy.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 334-400; Dec. Dig. ⬅125.]

4. MONOPOLIES ⬅31—CRIMINAL PROSECUTIONS—INDICTMENT—CERTAINTY.

Though, under such indictment, a conviction could be had only in so far as the conspiracy charged existed within the period of limitation and

as to the competitors in existence within such period, the allegations as to its prior existence and its existence against competitors who had ceased to exist more than three years before the finding of the indictment being merely descriptive, it was not void for uncertainty for failure to allege which of the competitors were in existence within the three years.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. &infin;31.]

5. MONOPOLIES &infin;31—CRIMINAL PROSECUTIONS—INDICTMENT—SUFFICIENCY.
An indictment for conspiring to restrain the interstate commerce of defendants' competitors in cash registers alleged, concerning the competitors therein named, that they had sold the greater portion of the cash registers manufactured by them to users and dealers whose several places of business were situated in states other than those wherein the cash registers were manufactured by such concerns, respectively, and had consigned for sale other cash registers to dealers and to their own agents in such other states, that they had been shipping such cash registers to such users, dealers, and agents in such other states, and that in doing so each of such competitors had been engaged in trade and commerce among the several states. Held, that this sufficiently showed that the trade and commerce in which defendants' competitors were engaged was interstate.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. &infin;31.]

6. MONOPOLIES &infin;12—STATUTORY PROVISIONS—CONSPIRACIES FORBIDDEN.
Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (Comp. St. 1913, § 8820), declaring illegal every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states or with foreign nations covers only contracts, combinations, and conspiracies which are unreasonably in restraint of interstate trade or commerce, though possibly every conspiracy is unreasonably in restraint thereof, on the theory that there can be no reasonable conspiracy, or conspiracy to do a reasonable thing.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. &infin;12.]

7. MONOPOLIES &infin;12—STATUTORY PROVISIONS—CONSPIRACIES FORBIDDEN.
Act July 2, 1890, § 1, relative to combinations and conspiracies in restraint of interstate commerce, includes conspiracies between competitors, or between the officers and agents of one competitor, on its behalf, against another competitor, and also includes conspiracies between any persons against any other person.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. &infin;12.]

8. MONOPOLIES &infin;12—STATUTORY PROVISIONS—CONSPIRACIES FORBIDDEN.
To bring a conspiracy within Act July 2, 1890, § 1, it is not essential that its execution be of any benefit to the conspirators; it being sufficient that it will be in restraint of another's interstate trade or commerce.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. &infin;12.]

9. MONOPOLIES &infin;16, 17—STATUTORY PROVISIONS—CONSPIRACIES FORBIDDEN.
Under Act July 2, 1890; § 1, relative to conspiracies in restraint of interstate commerce, the extent of the interstate trade or commerce conspired against is immaterial, and a conspiracy between the officers and agents of one competitor on its behalf to restrain a single interstate sale or shipment by another competitor is covered by it.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. §§ 12, 13; Dec. Dig. &infin;16, 17.]

&infin;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

10. MONOPOLIES ☞17—STATUTORY PROVISIONS—CONSTRUCTION—"MONOP-
LIZE."

Within Act July 2, 1890, c. 647, § 2, 26 Stat. 209 (Comp. St. 1913, §
8821), making it illegal to monopolize, attempt to monopolize, or combine
or conspire to monopolize, any part of the trade or commerce among the
several states, there can be no monopolizing in making a single interstate
sale, or a great number of such sales, even though wrongful means are
used in making them, and a wrong of some other nature is done com-
petitors, since to "monopolize" in a legal and accurate sense is to ex-
clude other persons, though not necessarily all persons, and there can
be no monopolizing with respect to a sale which in the nature of things
can be made by but one competitor, and in which there can be no com-
mon occupation.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig.
☞17.]

11. MONOPOLIES ☞13—STATUTORY PROVISIONS—CONSTRUCTION.

A monopolizing of interstate trade and commerce by efficiency in pro-
ducing and marketing a better and cheaper article than any one else is
not within Act July 2, 1890, § 2.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. ☞13.]

12. MONOPOLIES ☞12—STATUTORY PROVISIONS—CONSTRUCTION.

A combination of competitors, accompanied by an exclusion of out-
siders from interstate trade and commerce, or the exclusion by a com-
petitor, or its officers and agents on its behalf, of other competitors, by
the use of wrongful means, constitutes a monopolizing of such commerce
within Act July 2, 1890, § 2.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec.
Dig. ☞12.]

13. MONOPOLIES ☞17—STATUTORY PROVISIONS—CONSTRUCTION.

While but one competitor can make a sale, and though there can be
no monopolizing within Act July 2, 1890, § 2, in making a single inter-
state sale, or a great number of sales, though wrongful means are used
in making them, one competitor monopolizes interstate trade and com-
merce by excluding all or substantially all other competitors from the
free opportunity of approaching each and every prospective purchaser
on equal terms, or by driving them from the field of freely offering their
goods, so as to have that field to himself.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec.
Dig. ☞17.]

14. MONOPOLIES ☞17—STATUTORY PROVISIONS—CONSTRUCTION—"ANY PART
OF INTERSTATE TRADE OR COMMERCE."

Within Act July 2, 1890, § 2, prohibiting the monopolizing of any part
of the trade or commerce among the several states, "any part of inter-
state trade or commerce" embraces the interstate trade or commerce of
all prospective purchasers of a particular commodity in the United States,
or in some particular portion thereof, but excludes the interstate trade
or commerce of a particular prospective purchaser of a particular com-
modity.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec.
Dig. ☞17.]

15. INDICTMENT AND INFORMATION ☞125—DUPLICITY—MONOPOLIES—"MO-
NOPOLIZED."

An indictment in the first count charged a conspiracy by the officers
and agents of the N. Company in restraint of the interstate commerce
of its competitors therein named in the cash register business during 20
years, and alleged that during such period the N. Company had done
from approximately 80 per cent. early in the period to approximately 90
per cent. at the latter end thereof, of the business of manufacturing cash

registers, and that such officers and agents had conspired to accomplish their objects by the unlawful means therein specified. The second count charged that such officers and agents under the circumstances and by the means set forth in the first count had, by drawing to the N. Company, monopolized a part of the trade which otherwise would have been secured or retained by its competitors, and it made a part thereof the allegations of the first count descriptive of such trade and commerce, the concerns engaged therein, the means employed, and the knowledge, intent, and acts of the defendants. *Held*, that, while "monopolized," in the light of the context, meant "secured," the indictment charged defendants with monopolizing interstate commerce in cash registers, and not merely with monopolizing a part of such interstate commerce, and hence charged but a single offense, and was not duplicitous, as the offense of "monopolizing" consists, not only in obtaining or securing a monopoly by wrongful acts, but in holding and maintaining it by such acts, and it appeared from the indictment that the N. Company had a practical monopoly, and that the wrongful means specified were employed to maintain and hold such monopoly.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 334–400; Dec. Dig. ☜125.]

16. INDICTMENT AND INFORMATION ☜59—SUFFICIENCY OF ACCUSATION.

An offense intended to be charged in an indictment need not be charged expressly in general terms; it being sufficient if the facts alleged, if true, show the commission of the offense.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 180, 181; Dec. Dig. ☜59.]

17. MONOPOLIES ☜31—CRIMINAL PROSECUTIONS—INDICTMENT—CERTAINTY.

Where the first count of an indictment charging the officers and agents of the N. Company with conspiring to restrain the interstate commerce of the N. Company's competitors alleged that during 20 years many concerns had been engaged in a particular business, a list of such concerns, so far as known, being therein set out, without, however, alleging that all of the concerns named were in business during the entire 20 years, or alleging when any of them were so engaged in business, a count charging the defendants with monopolizing the trade which, but for their wrongful acts, would have been secured or retained by the concerns "mentioned" in the first count as having carried on business during the three-year period of limitation, and another count alleging that such defendants, having drawn to the N. Company by the means "mentioned" in the first count that part of the interstate trade in cash registers which otherwise would have been secured or retained by the concerns mentioned in the first count as having carried on business before the period of three years, continued to hold and carry on its interstate business augmented by such wrongful means, and thereby monopolized interstate trade in cash registers, were void for uncertainty; the first count having "mentioned" no concerns as carrying on business within three years or before three years.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ☜31.]

18. MONOPOLIES ☜29, 31—CRIMINAL PROSECUTIONS—SUFFICIENCY OF INDICTMENT.

A patentee and its officers and agents were not guilty of monopolizing interstate trade and commerce in cash registers, in holding such trade and commerce after securing it by wrongful means, if such trade and commerce was covered by its patents; and hence, where an indictment charging that the officers and agents of the patentee, having by wrongful means drawn to the patentee interstate trade and commerce which its competitors would otherwise have secured, continued to hold, conduct, and carry on its interstate business augmented by such wrongful means, and thereby monopolized interstate trade and commerce in cash registers, was de-

fective, where, though it showed that some at least of the patentee's patents had not expired, it did not allege that the trade and commerce so secured and held was not covered by those patents.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. §§ 19, 20; Dec. Dig. ☞29, 31.]

19. MONOPOLIES ☞29, 31—STATUTORY PROVISIONS—CONSTRUCTION.

A party monopolizing interstate commerce by employing wrongful means to drive its competitors from the field does not continue to monopolize such commerce, within Act July 2, 1890, § 2, by holding the business so secured after its competitors have ceased to compete; and hence an indictment charging a monopolizing within the period of limitations by holding the business previously obtained by such wrongful means was insufficient, where it did not allege the doing of anything to maintain and hold the monopoly during such period.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. §§ 19, 20; Dec. Dig. ☞29, 31.]

20. INDICTMENT AND INFORMATION ☞99—ALLEGATIONS AS TO VENUE—REFERENCE TO OTHER COUNTS.

Where the first count in an indictment charged a conspiracy to restrain the interstate commerce of defendants' competitors, another count, alleging that defendants, having by the means and under the circumstances and conditions described in the first count drawn to their company a part of the interstate commerce in cash registers which otherwise would have been secured or retained by its competitors, continued to carry on the interstate business of their company so augmented, and thereby monopolized interstate commerce in cash registers, did not make the allegations of the first count as to venue a part thereof.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 270, 270½; Dec. Dig. ☞99.]

21. CRIMINAL LAW ☞101—VENUE—STATUTORY PROVISIONS.

Judicial Code (Act March 3, 1911, c. 231) § 100, 36 Stat. 1121 (Comp. St. 1913, § 1087), dividing the Southern district of Ohio into two divisions and providing that certain terms of the District Court for the Western division shall be held at Cincinnati and certain terms for the Eastern division at Columbus, and that terms for the Southern district shall be held at Dayton on dates specified, that prosecutions for crimes and offenses committed in any part of the district shall be cognizable at the terms held at Dayton, and that all suits within either division may be instituted, tried, and determined at such terms, does not require that prosecutions shall be instituted at Dayton, nor that prosecutions instituted at Cincinnati or Columbus shall be transferred to Dayton for trial, and on a trial of the officers and agents of the N. Company, having its plant and principal office at Dayton, where a number of the defendants resided, it was not error to refuse to transfer the case from Cincinnati to Dayton for trial.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 199–205; Dec. Dig. ☞101.]

22. CRIMINAL LAW ☞149—LIMITATION OF PROSECUTIONS—CONSPIRACIES.

Under an indictment charging the officers and agents of the N. Company with conspiring to restrain the interstate business of the N. Company's competitors, which proceeded on the theory that there was a generic conspiracy extending over 20 years against all competitors, which as the various competitors named in the indictment came into existence was directed against them specifically, a conviction could be had only for conspiring in restraint of the trade or commerce of such of the competitors named in the indictment as were in existence during the three years prior to the finding of the indictment, and there could be no conviction for conspiring against the competitors who ceased to exist more

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

than three years prior to the finding of the indictment, or for the generic conspiracy so far as it existed prior to the three years.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 273–275; Dec. Dig. ☞149.]

23. MONOPOLIES ☞31—CRIMINAL PROSECUTIONS—EVIDENCE.

On a trial of the officers and agents of the N. Company for conspiring to restrain the interstate trade of the A. Company by making to such company and purchasers and prospective purchasers from it threats of infringement suits and by other means, the fact that the N. Company was successful in the lower court in a suit for infringement was at least prima facie evidence of probable cause, though the decree was reversed on appeal.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ☞31.]

24. MONOPOLIES ☞31—CRIMINAL PROSECUTIONS—EVIDENCE.

On such trial the mere fact that there was a conspiracy or joint purpose on the part of the defendants to restrain the trade of competitors of the N. Company, who ceased to exist before the A. Company was organized, by the use of certain unlawful means, was no evidence that they had such joint purpose as to the A. Company, when during the five years of its existence preceding the indictment there was no manifestation of such purpose.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ☞31.]

25. MONOPOLIES ☞31—CRIMINAL PROSECUTIONS—EVIDENCE.

Though under an indictment charging the officers and agents of the N. Company with conspiring to restrain the interstate business of such company's competitors, which proceeded on the theory that there was a generic conspiracy against all competitors extending over a period of 20 years, which as the various competitors named in the indictment came into existence was directed against them, there was evidence to make a question for the jury as to a conspiracy within the period of limitations only as against the A. Company, and only with respect to certain of the means of accomplishing the objects of the conspiracy set forth in the indictment, evidence that the defendants were parties to a generic conspiracy of the character mentioned, and that they conspired in restraint of competitors named who ceased to exist before the A. Company was organized, by the use of means other than those shown to have been employed against the A. Company within the period of limitations, was admissible as bearing on the question whether there was a conspiracy against the A. Company when it came into existence, which continued into the period of limitations.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ☞31.]

26. MONOPOLIES ☞31—CRIMINAL PROSECUTIONS—EVIDENCE.

Where such indictment alleged that to accomplish the objects of the conspiracy defendants induced, hired, and bribed employés of the N. Company's competitors to disclose the secrets of such competitors' business, and hired and bribed employés of carriers, etc., to disclose the secrets of their employers relative to the transportation of cash registers for such competitors, and instructed and required the N. Company's sales agents to ascertain and report all facts pertaining to the business of such competitors, though these acts were not calculated in themselves to restrain the trade or commerce of any competitor, their sole function being to enable defendants to use other means calculated to restrain such trade, evidence to show that the conspiracy included such means was admissible, and to be considered by the jury as bearing on the further question

whether the conspiracy also included effective means of restraining such trade and commerce.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ☞31.]

27. CRIMINAL LAW ☞150—LIMITATION OF PROSECUTIONS—"CONSPIRACY."

Where a conspiracy was in existence more than three years prior to the finding of the indictment, and continued into such period of limitation, it was not absolutely essential to support a conviction therefor that anything should be done in furtherance of the conspiracy within the three years, since a conspiracy is not merely an agreement to do an unlawful thing, or a lawful thing by unlawful means, but is initiated by the agreement, and, accurately defined, is a partnership in criminal purposes brought about by an agreement, and so long as the partnership continues the conspiracy continues, whether anything is done in furtherance of it or not.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 274, 275; Dec. Dig. ☞150.

For other definitions, see Words and Phrases, First and Second Series, Conspiracy.]

28. MONOPOLIES ☞29—CRIMINAL CONSPIRACIES—PARTIES.

Those officers and agents of a company manufacturing and selling cash registers having nothing to do with competition, as, for instance, those in the manufacturing department, could not be said to be parties to a conspiracy on the part of its officers and agents to restrain and destroy the interstate trade of its competitors.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 19; Dec. Dig. ☞29.]

29. CONSPIRACIES ☞40—CRIMINAL OFFENSES—PARTIES.

It was not sufficient to make persons parties to a conspiracy that they knew of it, or acquiesced in it, if they did not by word or deed become a party to it.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 73, 75–78; Dec. Dig. ☞40.]

30. MONOPOLIES ☞31—CRIMINAL PROSECUTIONS—EVIDENCE.

On a trial for conspiring in restraint of interstate commerce, evidence *held* to make a question for the jury as to whether there was a conspiracy extending over a great many years on the part of such officers and agents of a corporation as had to do with competition to restrain and destroy the interstate trade of such company's competitors, whether such conspiracy was by the use of certain of the means specified in the indictment directed against the A. Company when it came into existence, and whether the conspiracy continued against it into the period of three years preceding the finding of the indictment.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ☞31.]

31. CRIMINAL LAW ☞1158—REVIEW—QUESTIONS OF FACT.

It is not the province of an appellate court to weigh the evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3061–3066, 3070, 3071, 3074; Dec. Dig. ☞1158.]

32. MONOPOLIES ☞31—CRIMINAL PROSECUTIONS—EVIDENCE.

Where there was substantial evidence that the officers and agents of the N. Company were in a conspiracy to restrain the interstate trade of a competitor by causing certain wrongful acts to be done, and the question was whether such conspiracy had continued into the period of three years preceding the indictment, evidence as to the doing of such acts within such period in the regular course of the business of the N. Company by sales agents and salesmen of that company who were under the direct supervision of certain of the parties to the conspiracy was not

inadmissible on the ground that the defendants were not shown to have had any connection therewith; it being for the jury to determine whether these acts were accounted for by the continued existence of the conspiracy, and this was not the drawing of one inference from another.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ☞31.]

33. MONOPOLIES ☞31—CRIMINAL PROSECUTIONS—EVIDENCE.

On a trial of the officers and agents of the N. Company for conspiring in restraint of the interstate trade of the A. Company, competing with the N. Company in the sale of cash registers, there was evidence that a machine sold by the A. Company was out of order, that the agent of that company made repeated attempts to fix it, and that after he quit the employ of that company a piece of the mechanism was found to be bent, and it was the government's position that the agent bent it at the instance of the N. Company. *Held*, that evidence that when he left the employ of the A. Company several months afterwards he entered the employ of the N. Company, and that a few weeks before he did so one of the N. Company's competition men was seen in his store, did not sufficiently connect the N. Company with the defective condition of the machine to render this evidence admissible.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ☞31.]

34. MONOPOLIES ☞31—CRIMINAL PROSECUTIONS—EVIDENCE.

On the trial of the officers and agents of the N. Company for conspiring in restraint of the interstate trade of their competitors, evidence that a salesman of the N. Company attempted to induce a dealer who bought cash registers from a competitor and resold them to discontinue the business by threats of interference, and evidence of a similar transaction more than three years prior to the indictment, did not make a question for the jury as to a conspiracy with respect to the business of that competitor.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ☞31.]

35. MONOPOLIES ☞31—CRIMINAL PROSECUTIONS—EVIDENCE.

On a trial of the officers and agents of the N. Company under an indictment charging a conspiracy in restraint of the interstate trade of the N. Company's competitors, directed against the various competitors as they came into existence, on which it was claimed that the conspiracy had existed within the period of limitations as against the A. Company, evidence as to acts directed against other competitors within the three years, but not sufficiently tending to establish a conspiracy against them to make a question for the jury, did not tend to establish a conspiracy against the A. Company, and should not have been admitted.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ☞31.]

36. MONOPOLIES ☞31—CRIMINAL PROSECUTIONS—EVIDENCE.

On such trial, though there was a question for the jury only as to the conspiracy charged within the period of limitations as against the A. Company, evidence as to acts directed against other competitors tending to show a generic conspiracy against all competitors, and bearing on its fixed and absolute character and on its nature otherwise, was admissible, though relating in some instances to matters occurring in the early part of the 20 years during which the conspiracy was claimed to have existed.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ☞31.]

37. MONOPOLIES ☞31—CRIMINAL PROSECUTIONS—EVIDENCE.

Under an indictment charging a generic conspiracy on the part of the officers and agents of the N. Company engaged in manufacturing and

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

selling cash registers, in restraint of the interstate trade of all competitors of the N. Company, sought to be carried out by the means therein specified, though the only question for the jury under the evidence was whether such conspiracy within the period of limitations was directed against the A. Company by the use of certain of the means specified, evidence as to the use of other means not specified in the indictment against other competitors, who ceased to exist before the competitor in question was organized, was admissible to establish that the generic conspiracy was to use every possible wrongful means that might be effective in putting an end to competition.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ☜31.]

38. MONOPOLIES ☜31—CRIMINAL PROSECUTIONS—EVIDENCE.

On such trial, evidence as to the purchase by the N. Company of the business of other competitors prior to the organization of the A. Company, and how such purchases came about, and the contracts of purchase, were admissible as tending to establish a conspiracy to compel competitors to sell out to the N. Company by the use of any effective wrongful means, and thereby to establish a specific conspiracy against the A. Company to restrain its trade and commerce by other means, if not to compel it to sell out to the N. Company, though at the time of the purchase of the business of such competitors suits for patent infringement were pending against most of them, the evidence tending to show that the suits were not brought in good faith, and that in some of the cases the use of other wrongful means, and not the bringing of the suit, was the real cause of the competitors selling out, and it also appearing that the contracts of purchase prohibited them from engaging in the same business for 20 or 25 years, except in certain states where the business was not large.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ☜31.]

39. MONOPOLIES ☜31—CRIMINAL PROSECUTIONS—EVIDENCE.

On such trial, contracts with dealers in cash registers, who were mainly dealers in second-hand registers, eliminating them from the cash register field, was admissible as evidencing a purpose to acquire complete control of the business in second-hand cash registers of the N. Company's make, and to show a generic conspiracy, and its character, though they were not referred to in the indictment.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ☜31.]

40. CRIMINAL LAW ☜695—RESERVATION OF GROUNDS OF REVIEW—OBJECTIONS AND EXCEPTIONS.

On the trial of the officers and agents of the N. Company for conspiracy, though an objection to alleged minutes of the proceedings of conventions of the district managers of such company, on the ground that they were hearsay, raised the objection that before the minutes were read their accuracy should be guaranteed by the persons who made them, or by others who were present at the conventions, the objection should have been more specific, as such guaranty might have been furnished, and no error was committed in admitting the minutes over the objection made.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1633–1638; Dec. Dig. ☜695.]

41. MONOPOLIES ☜31—STATUTORY PROVISIONS—CONSPIRACIES PROHIBITED.

Under Act July 2, 1890, § 1, prohibiting conspiracies in restraint of trade or commerce among the several states, a patentee, its officers, and agents may not conspire in restraint of the interstate trade or commerce of a competitor in the article covered by its patent, though the competitor's business is an infringement of its patent; and hence, on the trial of the officers and agents of a company for conspiring in restraint of the

interstate trade of a competitor, evidence that such company held patents covering the machines made and sold by the competitor was not admissible.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ⚖⇒31.]

42. PATENTS ⚖⇒191—RIGHTS OF PATENTEE.

A patentee has the common-law right to make, use, or sell the article patented, and the statutory right to exclude or prevent others from making, using, or selling it, and to have others refrain therefrom.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 268; Dec. Dig. ⚖⇒191.]

43. MONOPOLIES ⚖⇒31—CRIMINAL PROSECUTIONS—EVIDENCE.

On a trial of the officers and agents of the N. Company under an indictment charging them with conspiring in restraint of the interstate trade of the N. Company's competitors, by the use of various wrongful means, under which there was a question for the jury as to whether such conspiracy within the period of limitations was directed against the A. Company by the use of certain of such means other than the bringing in bad faith of patent infringement suits, and evidence was admitted as bearing on the existence of a generic conspiracy against all competitors as to the bringing of such suits against competitors other than the A. Company to compel them to sell out or quit the business, which suits were terminated without a decision of the question of infringement by sales of the competitors' business to the N. Company, evidence that the N. Company held valid patents covering the business of such competitors was admissible, since, if there was real cause for bringing the suits, they were not brought in bad faith.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ⚖⇒31.]

44. MONOPOLIES ⚖⇒31—CRIMINAL PROSECUTIONS—EVIDENCE.

On such trial, evidence as to competitive tactics and aggressions on the part of the N. Company's competitors was admissible, as tending to show that the conspiracy against them was due to provocation, and that, there having been no provocation on the part of the A. Company, the conspiracy was never directed against it.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ⚖⇒31.]

45. CRIMINAL LAW ⚖⇒363—RES GESTÆ—LETTERS.

On the trial of the officers and agents of the N. Company for conspiring in restraint of the interstate trade of the N. Company's competitors, where a letter written by such company's vice president and manager to district managers about the time a quo warranto proceeding was instituted against the company for violating the anti-trust laws of a state, in which he stated that it was the policy of the company in no case to permit agents to misrepresent cash registers manufactured by other companies, or to induce any purchaser of a cash register made by any other company to break his contract, was in evidence, defendants should have been permitted to introduce as a part of the res gestæ the answers thereto by certain district managers, stating that such policy had been pursued in their districts.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 804; Dec. Dig. ⚖⇒363.]

46. CRIMINAL LAW ⚖⇒772—INSTRUCTIONS—LIMITATIONS.

On a trial under an indictment charging a conspiracy extending over a great many years against competitors of the N. Company, and directed against the various competitors of such company as they came into existence, though the court charged that defendants could not be found guilty unless they had conspired within three years prior to the indictment, defendants were entitled to specific instructions that they

⚖⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

could not be found guilty for conspiring against competitors who ceased to exist before the period of limitations.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1812–1814, 1816, 1817; Dec. Dig. ☞772.]

**47.** CRIMINAL LAW ☞814, 1172—QUESTIONS FOR JURY—FAILURE OF PROOF.

On a trial for conspiring in restraint of the interstate trade of competitors of a company by the use of various means specified in the indictment, it was reversible error to submit to the jury the question whether the conspiracy included means of which there was no evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1821, 1833, 1839, 1860, 1865, 1883, 1890, 1924, 1979–1985, 1987, 3128, 3154–3157, 3159–3163, 3169; Dec. Dig. ☞814, 1172.]

**48.** MONOPOLIES ☞17—CONSPIRACIES IN RESTRAINT OF TRADE—UNLAWFUL ACTS.

It was not unlawful for the officers and agents of a company manufacturing and selling cash registers to compare by comparative demonstrations or otherwise competitive cash registers with their cash registers, for the purpose of demonstrating the superiority of their register, and thereby induce prospective purchasers to buy it.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. ☞17.]

**49.** MONOPOLIES ☞17—CONSPIRACIES IN RESTRAINT OF TRADE—UNLAWFUL ACTS.

It was unlawful for the officers and agents of the N. Company, engaged in manufacturing and selling cash registers, to sell or offer and try to sell the N. Company's cash registers to persons who had bought and owned competing cash registers, if this involved the purchaser breaking his contract with the competitor in any particular, or was done for the purpose of driving the competitor from the field; and on a trial for conspiring in restraint of the interstate trade of competitors, an instruction that it was not unlawful for such officers and agents to sell or offer and try to sell cash registers to persons who owned competing registers in exchange at such price as was satisfactory to the parties needed qualification, and was properly refused.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. ☞17.]

**50.** MONOPOLIES ☞17—CONSPIRACIES IN RESTRAINT OF TRADE—UNLAWFUL ACTS.

Whether it was unlawful for the officers and agents of the N. Company, engaged in manufacturing and selling cash registers, to require the agents of that company to report the names of persons who had purchased cash registers from competitors, or to secure samples of machines put on the market from competitors, depended on the manner in which the information or samples were obtained or secured; and on a trial for conspiring in restraint of the interstate trade and commerce of competitors of the N. Company, an instruction that it was not unlawful to so require was too broad, and was properly refused.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. ☞17.]

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; Howard C. Hollister, Judge.

John H. Patterson and others were convicted of offenses, and they bring error. Reversed and remanded.

For opinion on demurrer to indictment, see 201 Fed. 697. See, also, 205 Fed. 292.

This is a criminal prosecution under Act July 2, 1890, 26 Stat. 209, c. 647. The indictment was found February 22, 1912, and contains three counts. The

offense which the first charges is that of engaging in a conspiracy in restraint of interstate trade and commerce under the first section of the act, and that which each of the other two charges is monopolizing a part of such trade and commerce under the second section. The defendants were 30 in number. Each, for many years, had been connected with the National Cash Register Company, a corporation engaged in the business of manufacturing and selling cash registers, with its principal place of business at Dayton, Ohio, within the district of the lower court, in the capacity of an officer or agent. All but four were so connected when the indictment was found; those four ceased their connection, three in 1910 and one in 1911; and four of them had been connected for at least 20 years continuously prior to its finding. The conspiracy with which they were charged was directed against competitors of that company, and the monopolizing was the exclusion of its competitors from such trade and commerce for its benefit. Trial was had, and all the defendants save one were found guilty under each count. Motion for new trial was sustained as to one, and the indictment was nollied as to him. Sentence as to another was deferred because of sickness, and pronounced as to the other. 27, who are the plaintiffs in error herein. The sentence of one, John H. Patterson, president, was a fine of $5,000 and confinement in jail for one year; that of 23, such confinement for one year; and that of 3 for nine months. The trial lasted nearly three months and 393 errors have been assigned. They bring up, so far as relied on, rulings adverse to defendants on demurrer to each count, on motion that the trial be had at Dayton, instead of Cincinnati, where the indictment was found, on the admissibility of evidence, some of which was admitted and some excluded, on motion to direct a verdict for defendants, and on requests to charge the jury.

The first count is quite long; each of the other two is short. The first makes certain introductory statements before charging the offense and alleging the facts, the doing of which it claimed constituted its commission. Those statements are:

(1) That "throughout the 20 years last past" inventors and manufacturers have invented and put upon the market cash registers; numerous patents, during said 20 years, having been issued to inventors, some basic and some for improvements, most of the former and many of the latter having expired long before the three years immediately preceding the finding of the indictment, and the number being so great as to prevent detailed description thereof and of the various inventions covered by them being set forth.

(2) That "during the said 20 years many concerns have been engaged, in the manner and under the circumstances hereafter set forth and in competition with each other, except as hereinafter shown, in the manufacture and sale, directly and indirectly, under letters patent and otherwise, of such cash registers, and that a list of the names of such of said concerns as are known to said grand jurors, showing their respective places of manufacture so far as known to said grand jurors, is as follows, to wit." The list contains the names of 33 different concerns, including the National Cash Register Company, and is found in the margin.[1]

---

[1] The National Cash Register Company, a corporation, Dayton, Ohio; the American Cash Register Company, Columbus, Ohio; the Michigan Cash Register Company, Detroit, Mich.; the Peninsular Cash Register Company, Detroit, Mich.; the Dial Cash Register Company, Milwaukee, Wis.; the St. Louis Cash Register Company, St. Louis, Mo.; American Cash Register Company, Philadelphia, Pa.; the Bensinger Cash Register Company, Chicago, Ill.; the Boston Cash Register Company, Northampton, Mass.; the Bundy Cash Register Company, Binghamtn, N. Y.; the Burdick-Corbin Company, Detroit, Mich.; the Century Cash Register Company, Detroit, Mich.; the Chicago Cash Register Company, Chicago, Ill.; the Cuckoo Cash Register Company, Detroit, Mich.; the Globe Cash Register Company, Detroit, Mich.; the Hallwood Cash Register Company, Columbus, Ohio; the Internatinal Company, Columbus, Ohio; Hopkins & Robinson, Louisville, Ky.; Hubinger-Carroll Company, New Haven, Conn.; the Ideal Cash Register Company, Bound Brook, N. J.; the Jewell Cash Register Company, Detroit, Mich.; the Kruse Cash Register Company, New York, N. Y.; the Lamson Cash Register Company, Lowell, Mass.; the Latimer Cash Register Company, Detroit, Mich.; the Metropolitan Cash Register Company, New York, N. Y.; the Navy Cash Register Company, Chicago, Ill.; the Osborn Cash Register Company, Detroit, Mich.; the Standard Cash Register Company, Orange, N. J.; the Sun Cash Register Company, Columbus, Ohio; the Toledo Cash Register Company, Toledo, Ohio; the Union Cash Register Company, Trenton, N. J.; the Weiler Cash Register Company, Detroit, Mich.

(3) That "of the total amount of manufacturing of such cash registers done by all of said concerns during said 20 years the National Cash Register Company has done from approximately 80 per cent. early in said period to approximately 95 per cent. at the latter end thereof."

(4) That "said concerns during said 20 years have also respectively sold the greater portion of their cash registers so manufactured by them, some to users of and some to dealers in such cash registers, whose several places of use and business have been situated in all the other states of the United States than those wherein such cash registers have been so manufactured by said concerns, respectively, and have sonsigned for sale other such cash registers to such dealers, and to their own agents in such other states; that in pursuance of such sales and upon such consignments said concerns have respectively been continually shipping such cash registers to such users, dealers, and agents in such other states, the number of such users, agents, and dealers being so great as to make it impracticable, if not impossible, to set forth a list of them in this indictment; * * * and that in and by so manufacturing, selling, consigning, and shipping such cash registers into other states than the state of manufacture each of said concerns has been engaged in trade and commerce among the several states of the United States, within the meaning of the act of Congress approved July 2, 1890."

(5) And that the National Cash Register Company "has had certain persons for its principal officers and agents, each of whom has been actively engaged in the management of the business and affairs of said the National Cash Register Company under its authority and to the full extent of his authority as such officer and agent; and that a list of said persons as are known to said grand jurors, showing so far as known to said grand jurors the character of their several offices and agencies and the time of their becoming such officers and agents, respectively, and, in case they have ceased to become such officers and agents, the time when they so ceased to become such officers and agents, is as follows, to wit," which list contains the names of 137 persons, including those of the 30 defendants.

These introductory statements were followed by a charge of the offense in general terms. It is alleged that the defendants, "being, as said grand jurors * * * charge they have been, the persons who have, by virtue of their being such officers and agents of said the National Cash Register Company, controlled and directed the business and affairs of said the National Cash Register Company unlawfully have, continuously and at all times from the days when, as in this count above set forth, they respectively became officers and agents of said the National Cash Register Company to the day of the finding and presentation of this indictment, or to the days when they ceased to be such officers and agents in cases where they did so cease to be such officers and agents at and within said Western division of said Southern district of Ohio, knowingly engaged and consciously participated in a corrupt, conspiracy in undue, unreasonable, * * * restraint of said interstate trade and commerce so as aforesaid, during such times, carried on by the several concerns in this count above named other than said the National Cash Register Company—each of said defendants then and there well knowing, as he then and there did know, all the premises in this indictment aforesaid; that is to say, a conspiracy to restrain, and which during and throughout such times has in fact restrained, said last-mentioned trade and commerce by divers unfair * * * means which, consideration being given to the advantage over said other concerns held by said the National Cash Register Company in consequence of its resources being, as they were, so great as compared with those of such other concerns, respectively, have unlawfully, wrongfully, and irresistibly excluded others from engaging in that trade and commerce, none of which has been justified or warranted by any letters patent."

From this charge in "generic terms" the count descended to "particulars." It characterized the particular allegation which followed as a "description" of the "conspiracy and means" thereby charged. In strictness it was an allegation of facts the doing of which it was claimed constituted the offense charged generally. The allegation was that, "intending to obstruct, restrict, and restrain the free flow of said interstate commerce so carried on by said concerns other than the National Cash Register Company, and compel those

concerns either to go out of business or to sell and transfer their business and facilities and instrumentalities for carrying it on to said the National Cash Register Company, so that said the National Cash Register Company could, as in most cases it in fact did, discontinue the business and the use of the facilities and instrumentalities so acquired by it, and thereby effectually and inevitably to eliminate and prevent all competition of such other concerns with said the National Cash Register Company (all of such other concerns being hereafter referred to as competitors), said defendants in their several capacities as such officers and agents of said the National Cash Register Company have by concerted and continuous endeavor carried on the business and affairs of said the National Cash Register Company upon a plan involving" 11 different things, which the count then proceeded to set forth in considerable detail. This allegation has been treated as the equivalent of an allegation that the defendants, whilst such officers and agents, conspired to accomplish the objects thus set forth by means of those 11 things, and we so accept it. The 11 things by means of which the defendants conspired to accomplish those objects may thus be summarized:

(1) Inducing, hiring, and bribing employés of the competitors of the National Cash Register Company, named, to disclose to it the secrets of their business, particularly as to prospective buyers, customers who had ordered, customers who had not fully paid, shipments to customers, agents, and dealers, volume of business, places where done, inventions, financial conditions, and connections.

(2) Inducing, hiring, and bribing employés of carters, truckmen, express companies, railroad companies, and telephone and telegraph companies to disclose to it the secrets of their employers pertaining to the carriage and transportation of the cash registers of such competitors.

(3) Instructing and requiring all its sales agents to ascertain and report all facts and details pertaining to the business of such competitors, and particularly of competitors coming into the competitive field.

(4) Using its influence and that of its agents with, and the making of unwarranted and false statements to, banking and other institutions, to injure the credit of such competitors and prevent them from securing accommodation of money, credit, and supplies.

(5) First. Instructing and requiring all its sales agents to interfere with, obstruct, and prevent, in every way possible, sales of such competitive cash registers by such competitors, and their agents and dealers in cash registers, and by any and all means to bring about sales of its cash registers, and the displacement of such competitive cash registers, and the substitution of its genuine cash registers therefor in the hands of users of cash registers, and particularly (a) by making to prospective purchasers of such competitive cash registers false statements derogatory of same, and reflecting injuriously upon the business character and financial credit of such competitors, and their ability and intention to perform their undertakings and make good their warranties and promises, and offering to sell to them cash registers at prices much less than the regular and standard prices and on unusually favorable terms as to payment; (b) by inducing persons who have already ordered such competitive cash registers to cancel their orders and purchase its cash registers through such statements and offers; (c) by inducing purchasers of such competitive cash registers who had only partially paid therefor to repudiate their contracts of purchase through such statements and offers and allowing them the amount they had paid; (d) by inducing purchasers of such registers, whether they had paid in full or not, to surrender them to it, in exchange for its registers for the purpose of exhibiting them in the windows of its stores where its registers were on sale, bearing placards with the word "Junk" or "For Sale at Thirty Cents on the Dollar" printed thereon; (e) by offering, to prospective purchasers of such registers, registers in similitude of any competitive registers they were contemplating buying, at a price much lower than the regular price thereof, and in cases at much less than the manufacturer's costs, which registers so offered were manufactured by it solely as a so-called "knocker," so as to cause such purchasers to believe that it was of such cheap and poor construction that it was a waste of money to purchase it or such registers; (f) and by offering to prospective purchasers of such

registers such knockers with weak and defective mechanism, and claiming that the registers they were contemplating buying had the same weak and defective mechanism. Second. And instructing and requiring its sales agents secretly to weaken and injure the interior mechanism, and remove and destroy parts of such mechanism of the cash registers of such competitors in actual use by purchasers, and thereby to cause them to become dissatisfied and substitute for them its cash registers.

(6) Making by it to such competitors and to purchasers and prospective purchasers of their cash registers of threats to begin suits in the courts against them for infringing and having infringed its patent rights pertaining to its cash registers, when, as each of them well knew, no such patent rights existed, and no such suit was contemplated or would really be begun, and such threats were made merely to harass such competitors, purchasers, and prospective purchasers, and deter such competitors from manufacturing and selling such competitive cash registers in such interstate trade and commerce and such prospective purchasers from buying and using such competitive cash registers.

(7) Beginning, in other cases, by it against such competitors and against purchasers of such competitive cash registers of suits for infringement of its patent rights pertaining to its cash registers, when, in those cases, they each well knew no patents upon which such suits could be maintained were in existence or owned or controlled by it, and when, as they each well knew, none of those suits would be further pressed, but all such suits would be kept pending only as long as they served the purpose of harassing such competitors and purchasers.

(8) Organizing cash register manufacturing concerns and cash register sales concerns and maintaining them, ostensibly as competitors of their company, but in fact as convenient instruments for use in gaining the confidence and obtaining the business secrets of competitors and accomplishing the objects of the conspiracy and making such use of competitive concerns from time to time acquired by it.

(9) Inducing by offers of much greater compensation the agents and servants of such competitors and dealers patronizing them to leave their employment and cease patronizing them and to enter its employment and patronize it.

(10) Applying and causing application to be made for patents upon the cash registers and the improvements thereupon of such competitors, for the purpose of harassing them by interference proceedings and suits and threats to institute such proceedings.

(11) Using of or originating and using of and instructing and requiring of its agents and sales agents to use of or to originate and use such other unfair means excluding other concerns besides it from engaging in said interstate trade as might at any time become or appear to them or those agents or sales agents to be necessary or convenient to accomplish the object of the conspiracy, a description of which means other than already described the grand jury are unable to set forth, because such means were so numerous in kind and shifting in character as to make such description impossible.

The count then concludes with the general charge that so it is that the defendants during the three years next preceding the finding of the indictment unlawfully have knowingly engaged and participated in a conspiracy in undue and unreasonable restraint of interstate trade and commerce in cash registers, which has restrained that trade and commerce by unfair means and means which have unlawfully and irresistibly excluded others from engaging therein.

The second count contains but a single sentence, and charges that the defendants, "at divers times during the three years next preceding the finding and presentation of this indictment, at and within the said Western division of the Southern district of Ohio, under the circumstances and conditions and by use of the means set forth and described in the first count of this indictment, unlawfully have, by drawing to said the National Cash Register Company and causing that company to grasp it, monopolized a part of the trade and commerce which, but for their use of those means, in carrying on the business and affairs of said the National Cash Register Company in the man-

ner in said first count specified would, during this period, have been secured or retained, as a matter of lawful right, by the divers concerns, other than said the National Cash Register Company mentioned in said first count as having carried on business during said three years—said means being, as in said first count shown and charged, unfair, oppressive, tortious, illegal, and unlawful under said circumstances as against said other concerns, and of a nature under said circumstances irresistibly to exclude those concerns from engaging in that trade and commerce; said grand jurors being unable by reason of the great extent thereof and because the same are unknown to them, the said grand jurors, to enumerate or describe the items of such trade and commerce in cash registers so monopolized by said defendants; and the allegations of said first count, descriptive of such cash registers, of said interstate trade and commerce in the same and the concerns engaged therein, and of the means employed by said defendants to restrain said interstate commerce and the allegations of said first count as to knowledge, intent, and overt acts on the part of and by said defendants being incorporated in this count by reference as fully as if they were repeated in this count as part of the charge of monopolizing in this count made."

The third count likewise contains a single long sentence, and charges that the defendants, "having before the period of three years next preceding the * * * indictment, in the manner, by the means, and under the circumstances and conditions mentioned and described in the first count, * * * engaged, as said grand jurors * * * here charge they did engage, in the unlawful conspiracy in said first count described, and having, in and by so engaging in that unlawful conspiracy, drawn, as said grand jurors * * * here charge they did draw, to said the National Cash Register Company, and caused, as said grand jurors * * * charge they did cause, said the National Cash Register Company to grasp, a part of the trade and commerce among the several states in cash registers; that is to say, that part of said trade and commerce which, but for their so engaging in that unlawful conspiracy and their use of those means, in carrying on the business and affairs of said the National Cash Register Company in the manner and under the circumstances in said first count specified, would have been secured or retained, as a matter of lawful right, by the divers concerns other than said the National Cash Register Company, mentioned in said count as having carried on business, before said period of three years (said means being, as in said first count shown and charged, unfair * * * under said circumstances as against said other concerns, and of a nature under said circumstances irresistibly to exclude those concerns from engaging in that trade and commerce), and each of said defendants well knowing all the premises in this indictment aforesaid, unlawfully have, throughout said period of three years next preceding the * * * indictment, continued to hold, conduct, and carry on said interstate business of said the National Cash Register Company, so by said means before said period augmented, and thereby have monopolized said interstate trade and commerce in cash registers—said grand jurors being unable, by reason of the great extent thereof, and because the same are unknown to them, the said grand jurors, to enumerate or describe the items of such trade and commerce so as in this count aforesaid monopolized by said defendants; and the allegations of said the first count descriptive of such cash registers of said interstate trade and commerce in the same, and the concerns engaged therein before said period of three years, and of the means so employed by said defendants, * * * also the allegations of said first count as to knowledge and intent on the part of said defendant, being * * * incorporated in this count by reference as fully as if they were repeated in this count made against said defendants."

Lawrence Maxwell, of Cincinnati, Ohio, and J. F. Wilson, of Columbus, Ohio, for plaintiffs in error.

S. T. McPherson, U. S. Atty., and E. P. Moulinier, Asst. U. S. Atty., both of Cincinnati, Ohio.

Before DAY, Circuit Justice, and COCHRAN and SANFORD, District Judges.

COCHRAN, District Judge (after stating the facts as above). [1] The first questions which come before us are those raised by the assignment complaining of the order overruling the demurrer to each count of the indictment. Only three of them need be noticed. They are that no offense against the United States was charged, and that it was void for uncertainty and bad for duplicity. The grounds of uncertainty and duplicity as to the first count are not seriously urged. Yet it will aid in bringing out its meaning, of which, in view of the other questions in the case, it is important to be sure, if we proceed upon the assumption that they are. Before indicating wherein these grounds are presented, the meaning of the count in two particulars should be determined. One is as to the duration of the existence of the competitors of the National Company named in the second item of the introductory statement. Is the meaning that each one of them was in existence during the entire 20 years preceding the indictment, and, if not, what is the meaning in regard thereto? A first blush view may lead to the conclusion that the meaning of the count is that each one of them was so in existence. But close observation will disclose that such is not its thought. The government so contends, and it is not urged otherwise by defendants. Perhaps it is in the interest of the claim of duplicity to have it that way. As a matter of fact no one of them was so in existence. It is only true to say that during the entire period one or more of them were in existence. Indicative that such is not its thought is the statement in the general charge of the conspiracy that the means by which its object was to be accomplished were such that they had "unlawfully, wrongfully, and irresistibly excluded others," and the further statement in the description thereof that the intent was to compel the competitors named either to go out of business or to sell and transfer their business to the National Company, so that in the latter case it could discontinue such business, "as in most cases it in fact did." This implies that in some, if not in many, instances that company did acquire the business of some of those competitors, and affirms that in most of those cases it discontinued the business. In such cases, therefore, the competitors did not continue to exist until the finding of the indictment. If, then, it is not the thought of the count that all the competitors were in existence at that time, it is not its thought that all were in existence at the beginning of the 20 years. We think, then, that its thought must be taken to be, in accordance with the fact, that during the entire 20 years there was no time that one or more of them were not in existence with no disclosure whatever as to when any of them were in existence other than that it was during that period. Such is the presupposition of the second and third counts as to the allegation of the first on this subject, and, not only this, but also that it mentions which of them were in existence and carrying on business during the three years preceding the indictment and which during the time preceding the three years, to which extent it is incorrect.

[2] The other particular is one as to which the parties differ. It is urged by defendants that the conspiracy charged is a conspiracy against the 32 competitors named, and not a general conspiracy against all competitors. This the government will not concede. But we think that there is no escaping the conclusion that the charge is of a conspira-

cy against the competitors who are named and that it is limited thereto. In charging the offense generally the allegation is that the conspiracy was in restraint of the interstate trade and commerce "carried on by the several concerns in this count above named other than the National Cash Register Company," and thereafter reference is made solely to them by the use of such phrases as "said" or "such other concerns than said the National Cash Register Company" or "said competitors" or "such competitors."

It is, then, in the truth of the positions thus taken as to the meaning of the count in these two particulars that an opening is made for the claim of duplicity. If its allegation were that each of the competitors named was in existence during the entire 20 years there would be no such opening. A single conspiracy against them specifically would include them all. But as they were not all so in existence, how is it possible for a single conspiracy to cover them? It may be thought that there must have been a conspiracy against those in existence at the beginning of the 20 years, and then successive conspiracies against the others as they came into existence. If such were the case, undoubtedly the count would be duplicitous.

In 5 R. C. L. p. 1081, it is said:

"The court will never be keen to hold an indictment bad for duplicity."

[3] But it is not necessary to give way to bias against the defense of duplicity here to rid ourselves of it. Though, as we have seen, the charge of the count is of a conspiracy against competitors who are named and is limited thereto, its underlying thought is that there was a generic conspiracy against all competitors, and that this conspiracy took specific direction against the competitors named as they came into existence, and continued against them as long as they remained in existence. In the second item of the introductory statement, where those competitors are named, it is alleged that they are all the competitors known to the grand jurors, which was as much as to say that if others had been known they would have been named also, and the charge would have been made that the conspiracy included them also. This could only have been on the basis that there was a generic conspiracy against all competitors. The effect of this consideration is merely to relieve the count of any claim of duplicity. It is the tie that binds. It did not render the defendants subject to conviction for the generic conspiracy so presupposed. In spite of it they were only subject to conviction for a conspiracy against the competitors who were named. What we have, then, in the count is a single conspiracy. It began at least 20 years preceding the indictment. At the beginning it was directed against the competitors named then in existence, and continued against them until they ceased to exist. As the others came into existence, it was directed against them, and continued against them until they ceased to exist, or, in case they had not ceased to exist at the time of the finding of the indictment, until then. And all of the defendants were not parties thereto during its entire existence, but only such of them—four in number—as were then connected with the National Company at the beginning of the 20 years. As the others became connected with it, they became parties to the conspiracy, and remained so until the finding

of the indictment, except as to the four who ceased their connection in 1910 and 1911, when they ceased to be parties thereto. Such we take to be the conspiracy charged in the first count.

[4] Of course the defendants were subject to conviction under the first count only in so far as the conspiracy charged existed within the three years preceding the indictment and as to the competitors who were then in existence. Because of the bar of the statute of limitations, no conviction could have been sought in so far as it existed prior to the three years. The reference to its prior existence and to its being against competitors not in existence during the three years was merely in order to a description of the conspiracy. Apart from this the count is to be taken as charging only a conspiracy within the three years against those of the competitors named then in existence. That it did not allege which of them were in existence did not render the count void for uncertainty.

[5] It remains to consider whether the count is defective in not charging an offense against the United States. There is but one particular in which it is claimed that it comes short of so charging, and that is in not alleging facts showing that the trade and commerce conspired against was interstate. In item 4 of the introductory statement the character of the trade and commerce in which the competitors named were engaged is set forth, and the charge is that it was that trade and commerce which was conspired against. Unless, therefore, such trade and commerce was interstate, the point is well taken. It is urged that, in determining whether it was or not, no help can be obtained from the claim made in that item that it was. It must be determined solely from what it is alleged that the competitors named had done. So limiting the consideration, it is claimed that all that is alleged could have been done, and yet the competitors not have been so engaged. As to sales and shipments pursuant thereto the allegation is satisfied by sales calling for delivery to the purchasers in the state of manufacture and shipments to them therein; the transportation from that state to the states of the purchasers being by them. And as to consignments for sale to dealers and agents the allegation is satisfied in the same manner. But in such cases the transportation from the state of manufacture to the state where the sale was to be had by the agents, if not also by the dealers, was by the competitors, through the agents and dealers. So doing, however, is such an unusual way of transacting business that the fair meaning of the allegation should be taken to be that the sales were for delivery in the state of the purchaser, and the shipments pursuant thereto were from the state of manufacture to such states, and so as to the consignments for sale. It is merely contended that the allegation does not "necessarily" mean this. Whilst it may not necessarily so mean, such we take to be its fair meaning, and whilst the claim that the business the competitors did was interstate cannot supply an omission in the allegation as to what they did, it can serve as an aid to its interpretation. It must be held, therefore, that the first count is good.

The second count alleges that the defendants had monopolized a part of the interstate trade and commerce in cash registers. It alleges that

defendants had so done at divers times during the three years preceding the indictment, within the lower court's district, and under the circumstances and conditions set forth and described in the first count. The way in which they had so done was by the use of the means therein set forth and described. They had thereby drawn that part of that trade and commerce to the National Company and caused it to grasp it. That part of that trade and commerce was the interstate trade and commerce in cash registers which, but for the use of those means by defendants, would have been secured or retained by the competitors named in the first count as having carried on business during those three years. It will be noted that the allegation is not that the defendants had monopolized the interstate trade and commerce in cash registers in the United States or in some particular portion thereof. It is that they had monopolized a part of such trade and commerce, and that the part which they had monopolized was that part thereof which the competitors referred to would have secured or retained, but for the use of those means by the defendants. The meaning of the allegation is no more than this—that by the use of those means the defendants had made interstate sales of cash registers for the National Company which, but for the use thereof, those competitors would have made. That such is its meaning is borne out by the allegation that it was "at divers times" that defendants had monopolized a part of that trade and commerce, and the further allegation that because the items thereof were unknown and of great extent they could not be enumerated or set forth in the count.

Assuming that what was done, as set forth in the count, constituted monopolizing within the second section, it is questionable whether the company was not the monopolizer and the defendants were mere aiders and abettors. But as aiders and abettors are liable as principals this is unimportant.

[6-9] Assuming, further, that the count charges no more than that defendants by the use of those means had made interstate sales of cash registers for the National Company which, but for the use thereof, those competitors would have made, the question arises whether this is an offense under section 2; i. e., whether the making by one competitor of an interstate sale or interstate sales of a commodity by the use of wrongful means which, but for the use thereof, another competitor or other competitors would have made, constitutes monopolizing a part of interstate trade and commerce by such competitor within the meaning of the second section. It should be approached through the first section. It is now settled that that section covers those contracts, combinations, and conspiracies only which are unreasonably in restraint of interstate trade or commerce. Possibly every conspiracy in restraint thereof is unreasonably so. This is on the idea that there is no such thing as a reasonable conspiracy, or a conspiracy to do a reasonable thing. It is a contradiction in terms. The section includes conspiracies between competitors, or between the officers and agents of a competitor on its behalf against a competitor. But it is not limited to such conspiracies. It includes also conspiracies between any persons, whoever they may be, against any other person. Loewe v. Lawlor,

208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815. It is not essential that the execution of the conspiracy be of any benefit to the conspirators. It is sufficient that it will be in restraint of another's interstate trade or commerce. And it is immaterial what is the extent of the interstate trade or commerce conspired against. In the case of Steers v. United States, 192 Fed. 1, 112 C. C. A. 423, it was held by this court that a conspiracy in restraint of a single interstate shipment was within the section. There is no act of interstate trade or commerce so insignificant as not to be protected by it. Clearly, then, a conspiracy between the officers and agents of one competitor on its behalf in restraint of a single interstate sale or shipment of another competitor is covered by it.

[10-12] But it does not follow from this that the making by one competitor of a single interstate sale or a great number of such sales by the use of wrongful means, which, but for the use of such means, another competitor would have made, is a monopolizing of a part of the interstate trade or commerce within the meaning of the second section, and covered by it. Whether it is covered by it depends upon what it is to monopolize, and what is "any part" of interstate trade or commerce, within its meaning. The word "monopolize" is used in this section in a legal and accurate sense. Its root idea is to exclude. To monopolize trade or commerce, or a part thereof, is to exclude persons therefrom. It is not, however, to exclude all persons. In the case of a perfect monopoly, which in experience has arisen only from a sovereign grant, the exclusion is of all persons but one, or, perhaps, a group of persons. By reason of such exclusion such person or group of persons secure the entire field covered by the grant to themselves. But it is not such monopolizing that the section has in mind. It is monopolizing by the acts of individuals. Mr. Justice McKenna, in National Cotton Oil Co. v. Texas, 197 U. S. 115, 25 Sup. Ct. 379, 49 L. Ed. 689, said:

"The idea of monopoly is not now confined to a grant of privileges, but is understood to include a condition produced by the acts of individuals."

In the case of such a monopoly it would seem that it is not essential that all but the insiders be wholly excluded, so that they have the whole field to themselves. It is sufficient that outsiders are substantially excluded, so that the insiders have to themselves approximately, or "a largely preponderating part of," the whole field. But the section does not cover every monopolizing by the acts of individuals. A monopolizing by efficiency in producing and marketing a better and cheaper article than any one else is not within it. However, possibly, efficiency is so abundant that in experience there never will be, as there never has been, such a monopolizing. It is possible for there to be a monopolizing by a combination of competitors. Such combinations have been divided into "combinations by agreement," or "loose combinations," in which each member of the combination remains in the field, notwithstanding the combination, as in the case of Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, and "combinations by fusion," or "corporate combinations," as in the Standard Oil and Tobacco Cases. Possibly in cases of the former class, where there is no exclusion of outsiders, it is not proper to say that there is a monop-

olizing, as in that contingency there is no exclusion. At most it may not be proper to say more than that there is a combination in restraint of trade. But in the latter case, notwithstanding there is no exclusion of outsiders, there is no reason for not characterizing what has been done as monopolizing, for in such case there is exclusion. The members of the combination are excluded for the benefit of the single corporation into which they are fused. Mr. Justice McKenna seems to have had such monopolizing in mind in the case of National Cotton Oil Co. v. Texas, supra, when he said:

"Its [monopoly's] dominant thought now is, to quote another, 'the notion of exclusiveness or unity'; in other words, the suppression of competition by the unification of interest or management, or it may be through agreement and concert of action. And the purpose is so definitely the control of prices that monopoly has been defined to be 'unified tactics with regard to prices.'"

A combination of competitors, accompanied by exclusion of outsiders, and the exclusion by a competitor, or by its officers and agents on its behalf, of competitors by the use of such means as are charged here, clearly constitute monopolizing within the section. Mr. Chief Justice White in Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, pointed out that monopolizing was a species of restraint of trade or commerce, so that a combination or conspiracy to monopolize a part of interstate trade or commerce is covered by both sections. In this particular they overlap. We have seen that conspiracies in restraint of trade and commerce are not confined to conspiracies by competitors, or on behalf of a competitor against a competitor. It is not even necessary that the execution of the conspiracy be of any benefit to the conspirators. It is sufficient that it will restrain the interstate trade or commerce of the person conspired against. But in the case of monopolizing under the second section, where there is exclusion by a competitor, or a combination of competitors, of competitors substantially from interstate trade or commerce, it is in order that the former may have the whole or approximately the whole of the field to itself or themselves. It is penalized, so that there may be no such exclusion, and the field may be occupied by all on equal terms.

It follows from this general survey that there can be no monopolizing in the legal and accurate sense of the word where there can be no common occupation. Where in the very nature of things there must be exclusion of all others but one, there can be no monopolizing. Hence it would seem that there can be no monopolizing in making a single interstate sale, or in making a great number of such sales, even though wrongful means are used in making them. A wrong has been done the competitors, but the wrong is not that of monopolizing. In the very nature of things but one competitor can make the sale. The idea that such conduct constitutes monopolizing is not according to the legal and accurate meaning of the word. It can only be such according to a popular conception thereof.

[13] But, though but one competitor can make a sale, all competitors can enjoy the free opportunity of approaching each and every prospective purchaser on equal terms, with the chance of making a

sale if he can persuade him to buy. For one competitor to exclude all or substantially all other competitors from such opportunity—i. e., drive them from the field of freely offering their goods, so as to have that field to himself—is to monopolize according to the legal and accurate sense of the word.

[14] This leads to a consideration of what is "any part" of interstate trade or commerce, within the meaning of the section. What are the possible parts of interstate trade or commerce that may be covered by it? The interstate trade or commerce in a particular commodity of all prospective purchasers thereof in the United States is a part of interstate trade or commerce; also the interstate trade or commerce in such commodity of all prospective purchasers thereof in some particular portion thereof is a part thereof. And also the interstate trade or commerce in such commodity of any prospective purchaser thereof wherever located in the United States is a part thereof. There can be no question that the first two are parts of interstate trade or commerce within the meaning of the statute. The case of Montague v. Lowery, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608, involved a monopolizing of the second part of interstate trade or commerce above referred to. The only question is as to the third part. Is the interstate trade or commerce of a prospective purchaser a part thereof within it? The case of Whitwell v. Continental Tobacco Co., 125 Fed. 454, 60 C. C. A. 290, 64 L. R. A. 689, involved the question whether it is. There a manufacturer of plug chewing tobacco had refused to sell to a jobber unless he would agree not to purchase such tobacco from its competitors, but to give his entire business to it, and the question was whether such conduct on its part was an attempt to monopolize a part of interstate trade or commerce under the section. This depended on whether the interstate trade or commerce of that jobber was a part of such trade or commerce within its meaning, and whether the means by which it was attempted to monopolize it was wrongful. It was held that the case did not come within the section. The apprehension that, if it was held that it did, then every interstate sale would be within it, seems largely to have brought it about. This is to be gathered from certain expressions in Judge Sanborn's opinion, repeated in United States v. Standard Oil Co. (C. C.) 173 Fed. 177, 191. He there said:

"Undoubtedly every person engaged in interstate commerce necessarily attempts to draw to himself, to the exclusion of others, and thereby to monopolize, a part of that trade. Every sale and * * * transportation of an article which is the subject of interstate commerce evidences a successful attempt to monopolize that trade or commerce which concerns that sale or transportation. If the second section of the act prohibits every attempt to monopolize any part of interstate commerce, it forbids all competition therein, and defeats the only purpose of the law; for there can be no competition, unless each competitor is permitted * * * to draw to himself, and thereby to monopolize, some part of the commerce."

But there was no reason for such apprehension, for, as we have seen, interstate sales do not come within the section, because in such cases there is no monopolizing. It is only the conception of the meaning of that word according to popular speech that could create such

an apprehension. It was such a conception that led Judge Ward in United States v. American Tobacco Co. (C. C.) 164 Fed. 700, 727, to say:

"As this section prohibits a monopoly of, or an attempt to monopolize, any part of such commerce, it cannot be literally construed. So applied, the act would prohibit commerce itself."

In dealing with this subject the Supreme Court, speaking by the Chief Justice, in the Standard Oil Company Case, 221 U. S. 61, 31 Sup. Ct. 516, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, said:

"The commerce referred to by the words 'any part,' construed in the light of the manifest purpose of the statute, has both a geographical and a distributive significance; that is, it includes any portion of the United States and any one of the classes of things forming a part of interstate or foreign commerce."

This excludes therefrom the interstate trade or commerce of a particular prospective purchaser of a particular commodity, and confines it to the interstate trade or commerce of all prospective purchasers of a particular commodity in the United States or in some particular portion thereof. Reasoning from the analogy to a monopolizing by sovereign grant leads to the conclusion that such is a true construction of the section. In case of such monopolizing it is of a particular commodity, and in olden times in England it was limited in some instances to particular portions of the kingdom.

[15] The second count charges that defendant had monopolized a part of the interstate trade and commerce in cash registers "under the circumstances and conditions set forth and described in the first count," and in the latter part it makes part thereof the allegations of that count descriptive of that trade and commerce, the concerns engaged therein, and the means employed by defendants, and as to knowledge, intent, and overt acts on the part of and by defendants. In the light of the entire context, we think the word "monopolized" should be construed as meaning "secured." So construing it, the question arises whether the offense which the count charges is not that of monopolizing the interstate trade and commerce in cash registers, and not a part thereof.

[16] There is no rule of law requiring the offense intended to be charged in an indictment to be charged expressly in general terms. It is sufficient if the facts alleged, if true, show the commission of the offense. If, then, the effect of what the second count alleges that the defendants had done, if done by them, was the commission by them of the offense of monopolizing the interstate trade and commerce in cash registers, that is the offense charged against them, and to which reference was had by the use of the words "charge of monopolizing in this count made" at the end of the second count.

Now, the offense of monopolizing consists not only in obtaining or securing, in the first instance, a monopoly by the wrongful acts of individuals, but in holding and maintaining it by such acts. According to the allegation of the first count, during the preceding 3 years the National Company had a practical monopoly in cash regis-

ters. It did approximately 95 per cent. of the manufacturing and selling of cash registers. Also, according thereto, the defendants carried on the business of the National Company on a plan involving the use of the means therein set forth, with the intent and purpose to restrain the interstate trade and commerce of all its known competitors and to drive them out of business. Such are the circumstances and conditions under which it is alleged that the defendants had secured for the National Company interstate sales of cash registers by the use of those means which, but for the use thereof, would have been secured by those competitors. Such action on the part of defendants was calculated to hold and maintain the monopoly which the National Company had. It being done with such intent, it was done with the intent to maintain and hold the monopoly. It seems to us, therefore, that the count does charge the commission of the offense of monopolizing interstate trade and commerce in cash registers during the 3 years preceding the indictment. This being so, it is not duplicitous. It charges but a single offense.

[17] But this is not all that is to be said upon this count. The competitors whose interstate trade and commerce are alleged to have been secured by defendants for the National Company by the use of the means complained of are alleged to be those "mentioned in said first count as having carried on business during said 3 years." When, however, we turn to the first count, we do not find any of the competitors named therein mentioned as having carried on business during the 3 years preceding the indictment. It is only on the hypothesis that the count alleges that all of the 32 competitors carried on business during the whole 20 years that it can be said that it mentions those of them who carried on business during the 3 years. But we have seen that the government does not contend that such is the meaning of the allegation and we have held that it does not mean it. It means no more than that during the entire 20 years some of the competitors were carrying on business, without giving any indication whatever as to when any of them were so doing. The competitors, then, whose business it is alleged the defendants secured by the use of those means, are incapable of identification. It is not those who in fact carried on business during the 3 years, but those which the first count mentions as then carrying on business; and it does not mention which of them so did. We see no escaping from the conclusion that the count on this ground is void for uncertainty. We are aware that the point is somewhat technical, and that it is in the air now that the courts should be indulgent to looseness in pleading, even in an indictment. But that indulgence goes no farther than that an indictment is to be "taken to mean what it fairly conveys to a dispassionate reader by a fairly exact use of English speech." It should not go to the extent of taking it to mean that which "by a fairly exact use of English speech" it does not mean, or, in other words, when it says competitors "mentioned in said first count as having carried on business during said 3 years," it should be taken to mean competitors who did carry on business during those 3 years. The words of Mr. Justice Brewer in Clyatt v.

United States, 197 U. S. 207, 25 Sup. Ct. 429, 49 L. Ed. 726, come in here. They are:

"Only in the exact administration of the law will justice in the long run be done, and the confidence of the public in such administration be maintained."

On this ground we think the count is defective, and that the court erred in overruling the demurrer thereto.

[18] This brings us to the third count, and we need not spend much space upon it. It charges that the defendants, having before the 3 years preceding the indictment, engaged in the unlawful conspiracy described in the first count, and having by engaging therein drawn to the National Company and caused it to grasp that part of the interstate trade and commerce which, but for their engaging therein and by the use of the means described in the first count, would have been secured or retained by the competitors mentioned in the first count as having carried on business before those 3 years, had during those 3 years continued to hold, conduct, and carry on the interstate business of The National Company so by those means before those 3 years augmented and thereby had monopolized the interstate trade and commerce in cash registers. The monopolizing here charged, it will be noted, is not of a part of said trade and commerce, but such trade and commerce. It differs from the second count, in that it does not allege that during the 3 years preceding the indictment defendants had secured for the National Company any such trade or commerce by the use of wrongful means, which, but for the use thereof, would have been secured by its competitors. What it charges the defendants did was that during the 3 years they had continued to hold, conduct, and carry on the interstate business of the National Company, augmented by the interstate trade and commerce in cash registers which before the 3 years, by the use of the means complained of, they had drawn to the National Company and caused it to grasp, and which, but for the use of those means, would have been secured or retained by those of its competitors mentioned in the first count as having carried on the business before the 3 years. It will be noticed that the same uncertainty exists here as to the interstate trade and commerce in cash registers secured by the National Company, by the use of those means, before the 3 years, and held on to by it during the 3 years. It is that which, but for the use thereof, would have been secured by those of its competitors which are mentioned in the first count as having carried on business before the 3 years preceding the indictment. The first count no more mentions which of them carried on business before the 3 years than it does those which so did during the 3 years. On this ground the count is bad.

But it is otherwise insufficient. It does not charge an offense against the United States, i. e., the offense of monopolizing a part of interstate trade and commerce, and that for two reasons. According to the allegations of the first count, made a part of this, the cash registers manufactured and put on the market by the National Company during the 20 years were patented. It owned patents which covered them. So far as the third count goes, the interstate trade and commerce

which it so secured may have been covered by its patents, and it was in law entitled to it thereunder. It may not have had a right to get it in the way charged, but should have asked the courts to protect its rights. This is a question that will be considered later. In holding onto it thereafter it could not have been guilty of monopolizing, even if otherwise it might have been. The indictment, having thus charged that the National Company had patents covering the cash registers made and sold by it, should have negatived that the trade and commerce which it so secured and held onto was covered by those patents. In the first count it is alleged that defendants' conduct therein complained of was not "justified or warranted by any letters patent"; but it was not meant thereby to charge that the trade and commerce affected by the conspiracy complained of therein was not covered by the National Company's patents, for it is the position of the government that the defendants were not justified or warranted by those patents in protecting the rights so secured in that way. It is charged in the first count that at the beginning of the 20 years the National Company did 80 per cent. of the manufacturing of cash registers. This of itself was a practical monopoly. It is not alleged that it had been secured by wrongful acts. Presumably it was entitled to it under its patents. It is true that it is alleged that long before the 3 years preceding the finding of the indictment most of the basic patents and many of the improvement patents had expired. But this concedes that some of the basic patents were then still unexpired at the beginning of the 3 years, and it is consistent with the fact that such was the case as to a great number of improvement patents. Everything, therefore, which the count alleges, may be true, and yet the National Company have been entitled to hold onto the business which it had so secured, in which case its conduct in so doing could not have been monopolizing.

[19] But otherwise the count does not charge the offense of monopolizing, in that it does not allege that defendants had done anything during the three years to maintain and to hold its monopoly. In the case of a monopoly brought about by monopolizing through a "combination by fusion" or "corporate combination," the monopolizing exists as long as the combination continues to exist. It can at any time be dissolved, and its constituent elements restored to existence. But in the case of a monopolizing by wrongful means, as here, the monopolizing ceases whenever the pugnacious competitor ceases to fight. It is not possible to resurrect the competitors who have been slain in the contest and restore to them what they have lost. Such competitor does not continue to monopolize, within the meaning of the statute, in holding onto the spoils of victory. It is never to be lost sight of that actually doing business, no matter how large, is not monopolizing. It is excluding from the opportunity of doing business that is. If it is thought that this is an evil condition of things, which should not be allowed to continue, the answer is that things should not have been allowed to get in that condition. The competitors attacked should have called upon the courts to protect them whilst they were being attacked.

222 F.—40

In the case of United States v. Irvine, 98 U. S. 450, 25 L. Ed. 193, it was held that the offense of withholding pension money was complete upon its first being withheld, and that it did not continue thereafter, even though the money was never paid to the pensioner. And in the case of United States v. Kissel, 218 U. S. 607, 31 Sup. Ct. 126, 54 L. Ed. 1168, Mr. Justice Holmes said:

"It also is true, of course, that the mere continuance of the result of a crime does not continue the crime."

[20] It is also urged that the third count is bad for failing to allege proper venue. It would seem to be clear that it was essential to allege that the offense charged was committed within the district where the indictment was found. Otherwise, the court had no jurisdiction of the offense. It would seem clear, also, that the third count is not aided by the allegation of venue in the first and second counts, unless such allegation is incorporated in the third count by reference thereto. The government does not differ with the defendants as to these two propositions. Its position is that the allegation of the first count as to venue is so incorporated in the third. It makes this out from the fact that it alleges by way of recital that the defendants had, prior to the three years preceding the indictment, engaged in the unlawful conspiracy charged in the first count "under the circumstances and conditions mentioned and described in the first count." But this has reference to the conspiracy charged in the first count. It has no reference to the offense charged in the third count, to wit, of holding, conducting, and carrying on the business unlawfully acquired.

It must be held, therefore, that the third count is bad, and the lower court erred in overruling the demurrer thereto.

[21] 2. We come now to the assignment that the court erred in overruling defendants' motion that the trial be had at Dayton. Section 100 of the Judicial Code divides Ohio into two judicial districts, Northern and Southern, and the Southern into two divisions, Western and Eastern. It provides that certain terms of the District Court for the Western division shall be held at Cincinnati and certain for the Eastern at Columbus. Then follows this provision:

"Provided, that terms of the District Court for the Southern district shall be held at Dayton on the first Mondays in May and November. Prosecutions for crimes and offenses committed in any part of said district shall also be cognizable at the terms held at Dayton. All suits which may be brought within the Southern district, or either division thereof, may be instituted, tried and determined at the terms held at Dayton."

This is a continuation or re-enactment of the act of March 4, 1907 (34 Statutes at Large, 1294), which first provided for the holding of terms of court at Dayton. This prosecution was instituted at Cincinnati. It is not claimed that the lower court abused its discretion, if, indeed, it had any, in overruling this motion, but that defendants were entitled as a matter of right to have the case transferred to Dayton for trial. The sole ground of the motion was that the National Company's plant and principal office is located there, and 11 of the defendants resided there, and that none of them resided at Cincinnati. We fail to find any basis whatever for this position. It will be noted that

Dayton is made a place for holding court for the entire Southern district. As to prosecutions for crimes and offenses committed in any part of the district, they "shall be cognizable" and as to suits which may be brought within the district—i. e., of which it has jurisdiction—they "may be instituted, tried and determined" at Dayton. The provision that such prosecutions shall be cognizable at Dayton does not require that they be instituted there; otherwise no prosecution could be instituted at Cincinnati or Columbus, but all would have to be instituted at Dayton. No more does it require that any prosecution instituted at Cincinnati or Columbus shall be transferred there for trial. The only possible question which can arise is whether any prosecution instituted at Cincinnati or Columbus can be transferred to Dayton. The original act provided for such transference of pending suits, and nothing else. This assignment, therefore, is not well taken.

[22] 3. Chronologically the assignments calling in question the rulings on the admissibility of evidence come next. But we prefer to pass at once to the assignment that error was committed in overruling defendants' motion to direct the jury peremptorily to find a verdict for them. As introductory to its consideration, two things should be clearly understood. One is as to what, under the evidence, was the case which it was open to the government to claim should be submitted to the jury. It was whether within the 3 years preceding the indictment the defendants conspired in restraint of the interstate trade or commerce in cash registers of the American Company of Columbus by the use of the fifth and ninth means specified therein. We make this out in this way: Certainly it was not more than whether the defendants within that time conspired in restraint of such trade or commerce of the competitors named who were in existence during the 3 years by any of the means specified. It did not include whether they at any time conspired against any other of the competitors named therein because, as they had ceased to exist prior to the 3 years, defendants could not have conspired against them within the 3 years, and, so far as they conspired against them prior to the 3 years, i. e., whilst they were in existence, as the prosecution therefor was barred by the statute of limitations, the indictment did not seek conviction for the conspiracy as to them. Nor did it include whether they at any time conspired generally, i. e., against all competitors, because whilst, as we have seen, the underlying thought of the first count is that they so conspired, and that this conspiracy was directed against the competitors named during and as they came into existence, the count did not seek conviction for such generic conspiracy. Properly construed, it sought conviction for a conspiracy against the named competitors only, and those only who were in existence during the 3 years. And so far as such generic conspiracy existed prior to the 3 years the prosecution for it, too, was barred. It follows, therefore, that that case was not more than whether the defendants within the 3 years conspired in restraint of such trade or commerce of the American of Columbus, the Michigan, the Peninsular, the Burdick-Corbin, the Jewell, and the Dial, by any of the means specified, for these were the only competitors who were in existence during the

3 years. The Bensinger and Hopkins-Robinson were not in existence at any time within the 20-year period, the St. Louis is not mentioned in the evidence, the Bundy was not in the cash register business, and all the others ceased to exist prior to the 3 years. The last of them to go out of existence was the Union, and it ceased to exist as a competitor November 1, 1906.

[23, 24] But the case was not even this much. It is not claimed by the government that the generic conspiracy was ever directed against the Peninsular, the Burdick-Corbin, the Jewell, or the Dial. It only claims that it was directed against the American of Columbus and the Michigan. The American came into existence not later than the early part of 1907, and the Michigan in 1908. And so far as the Michigan is concerned there was no substantial evidence that such conspiracy was ever directed against it. There was evidence of but two acts which can be said to have been unfriendly towards it, only one of which was in the 3 years. They were directed, not against it, but against two dealers in the machine, who purchased them outright and resold them. Its president and organizer, who had been connected with the National Company and who ceased his connection therewith in July, 1907, then holding the position of general manager, was one of the principal witnesses for the prosecution, and he made no complaint whatever of the National Company's attitude or action toward his company. Possibly the reason why the generic conspiracy, assuming that there was one, was never directed against these five companies, i. e., the Peninsular, the Burdick-Corbin, the Jewell, the Dial, and the Michigan, was because they did not seriously endanger the National supremacy. And, in view of this, perhaps the generic conspiracy should be stated to be, not that it was against all competitors, but only against such as might endanger such supremacy. Such is the way, then, in which we limit the case which it was open to the government to claim should be submitted to the jury to the American of Columbus. But we also limit it under the evidence as to the means to be used in accomplishing the object of the conspiracy against that competitor; i. e., to the fifth and ninth. It is not claimed that the defendants conspired to use the fourth means against any competitors. The first, second, and third means were not means to accomplish that object. They were not calculated, in and of themselves, to restrain the trade or commerce of any competitor. If no use was made of the information thereby obtained, no competitor would be restrained in his trade or commerce. Their sole function, therefore, was to enable the defendants to use other means which, in and of themselves, were calculated to restrain. It did not include the sixth, seventh, and tenth means, because there was no substantial evidence that the defendants at any time, much less within the 3 years, conspired in restraint of that company by the use of those means.

It may be assumed in this connection that there was substantial evidence that the generic conspiracy and the specific conspiracy against the competitors who ceased to exist prior to 1907 included the use of such means, but it does not follow that the conspiracy against the American of Columbus included the use thereof. There was not a

particle of evidence that any such applications for patents as are called for by the tenth item, or that threats to that company, or to any purchaser or prospective purchaser of its machines, to begin suits for infringement against it or him, called for by the sixth item, were ever made. But a single suit for infringement was ever brought. That was brought against that company itself in the District Court of the Southern District of New York in 1908. The National obtained therein a decree of infringement, which was reversed on appeal. National Cash Register Co. v. American Cash Register Co., 178 Fed. 79, 101 C. C. A. 569. The patent was held invalid because of the sale of a single machine covered by it more than 2 years before its issue. The fact that the National was successful in the lower court is at least prima facie evidence of probable cause. The mere fact that there may have been a conspiracy—i. e., a joint purpose on the part of the defendants to restrain the trade of the competitors who ceased to exist before the year 1907 by the use of such means—is no evidence whatever that they had such joint purpose as to the American of Columbus, when during the 5 years of its existence preceding the indictment there was no manifestation of such purpose. The same is true as to the means covered by the eighth and eleventh items. We assume here, also, that there was substantial evidence that the generic conspiracy and the specific conspiracy against the competitors who ceased to exist prior to 1907 included the use of the means specified in the eighth item, and of other effective means not specified at all, but covered by the eleventh item. But there is not a particle of evidence that the defendants at any time within the 5 years of its existence contemplated the use of such means against the American of Columbus. And so it is that we limit the case which was open for the government to claim should be submitted to the jury to whether the defendants within the 3 years preceding the indictment conspired in restraint of the interstate trade or commerce of the American of Columbus by the use of the means described in the fifth and ninth specifications.

[25] But in so limiting that case we are not to be understood as holding that the jury were not to consider at all whether the defendants conspired in restraint of the competitors named who ceased to exist prior to 1907 during their existence by the use of all the effective means specified except the fourth and of other effective means not specified covered by the eleventh item, and whether they were parties to a generic conspiracy of that character, and that evidence to this effect was not admissible. Our position is simply that those were subordinate issues in the case. The ultimate issue therein was whether the defendants had so conspired against the American of Columbus. The former issue had bearing on the question whether there was a generic conspiracy, and the latter on the question whether there was a conspiracy against the American of Columbus when it came into existence, which continued into the 3 years. Our purpose in putting the matter thus is to bring out sharply just what was the ultimate issue in the case, after the close of the evidence. A clear understand-

ing of this will aid us in disposing of the question in hand, and also the other questions yet to be considered.

It is, however, urged on behalf of defendants that the decision in the case of Commonwealth v. Harley, 7 Metc. (Mass.) 506, is against the consideration of a generic conspiracy in this case at all. It was there held that, under an indictment charging a conspiracy to defraud Stephen W. Marsh, evidence was not admissible of a conspiracy to cheat the public generally, or any person who might fall in the way of the conspirators. This was, however, on the ground— it could only have been on that ground—that the charge in the indictment excluded the thought of a generic conspiracy, and charged a conspiracy which in its origination was a specific conspiracy against Stephen W. Marsh. But that is not the case we have here. It is true that the indictment charges a specific conspiracy only, but it is not a conspiracy which was specific in its origination. In its origination it was a generic conspiracy, which became a specific conspiracy by being directed against the competitors named as they came into existence. Hence it was a pertinent question in the case whether there was a generic conspiracy during the 20 years, and there was no variance.

In the case of People v. Gilman, 121 Mich. 187, 80 N. W. 4, 46 L. R. A. 218, 80 Am. St. Rep. 490, a conviction was upheld under an indictment charging a conspiracy to defraud Edwin H. Sadler upon evidence of a conspiracy to cheat such persons as might be induced to attend certain seance meetings, and that he attended them. The decision is in conflict with the Massachusetts case, unless the indictment permitted the construction that it charged a specific conspiracy against Sadler by reason of a generic conspiracy being directed against him.

[26] So as to the first, second, and third means—the means which in and of themselves were noneffective—evidence tending to show that the conspiracy included them was admissible. And so far as there was substantial evidence to the effect that it did, it was for the jury to consider whether it did, but only as bearing on the further question whether it included, also, any of the effective means.

[27] The other thing which at this point should be clearly understood is whether, in order to there being such a case for submission to the jury, it is absolutely essential that anything was done in furtherance of such conspiracy within the 3 years preceding the indictment. We think that it is not. And this follows from Mr. Justice Holmes' illuminating and most helpful opinion in the case of United States v. Kissel, 218 U. S. 601, 31 Sup. Ct. 124, 54 L. Ed. 1168. Before the decision in that case the question of the continuance of a conspiracy was in confusion and the authorities in conflict. There is no longer any confusion. The position there combated was that a conspiracy could not have continuance in time. It was urged that it could not, because it consisted in an unlawful agreement, and an agreement does not have continuance. That that was what it consisted in seemed to be justified by the common definition of a conspiracy as an agreement to do an unlawful thing, or to do a lawful thing by unlawful means. But this is no longer an accurate definition of a conspiracy. The agreement simply initiates the conspiracy, but it is not the whole of it. Mr. Justice Holmes said:

"It is true that the unlawful agreement satisfies the definition of the crime, but it does not exhaust it."

And again he said:

"A conspiracy is constituted by an agreement, it is true; but it is the result of the agreement, rather than the agreement itself, just as a partnership, although constituted by a contract, is not the contract, but is the result of it. The contract is instantaneous; the partnership may endure as one and the same partnership for years. A conspiracy is a partnership in criminal purposes."

Here we have an accurate definition of a conspiracy. It is "a partnership in criminal purposes," to which we might add, brought about by an agreement. So long, then as the partnership in a criminal purpose continues, the conspiracy continues. And it may continue without anything being done in furtherance of it. X. and Y. conspire on a day or two before the beginning of the period within which an indictment on a certain date may be found to murder Z., or to commit some other crime, on a day certain one week off; i. e., several days after the beginning of that period. After the beginning thereof, they abandon the conspiracy, either by a formal understanding, or by allowing the day to go by without doing anything, and never renewing it. In such case the partnership in the criminal purpose continues into the period. In so far, then, as it continued into the period, it was not barred by the statute of limitations. The mere fact that the prosecution for the agreement which initiated the partnership is barred is no reason for barring it as to so much of the partnership as has continued into the period. It may be important to show something done in furtherance of the conspiracy within the period to establish its continuance into it. It is not essential to its continuance thereinto.

We come, then, to the question whether the government was entitled to a submission of such case to the jury. This depends on whether there was substantial evidence in support of that case. By substantial evidence we mean evidence fit to induce conviction. And in determining this we limit ourselves entirely to the government's evidence, for it is not the province of the court, on a motion for a peremptory instruction, to weigh the evidence. That is for the jury only, except that it may be weighed by the court on a motion for new trial. Jenkins & Reynolds Co. v. Alpena Portland Cement Co., 147 Fed. 641, 77 C. C. A. 625.

[28, 29] In order for the defendants to have so conspired it is essential that they had such connection with the National Company that in the performance of their duties they had to do with its competitors. Those of its officers and agents who had nothing to do with competition, as, for instance, those in the manufacturing department, cannot be said to have so conspired. It is not sufficient to connect any officer or agent of the National Company with the conspiracy that they knew of it or acquiesced in it. They must by word or deed have become a party to it. People v. Richards, 1 Mich. 216, 51 Am. Dec. 85; 5 R. C. L. p. 1065.

[30] The president and general manager of the company had to do with competition. Both, the latter under the former, had supervision

of its entire business. They were located at Dayton. The United States was divided into sixteen districts. Over each was placed a district manager. Those district managers were located in the principal cities of the country. They had complete charge of the business in their respective districts, which included sales and competition. Sales were made by sales agents and salesmen distributed throughout the country; the latter being under the former, and both under the district managers. In making sales they were brought into contact with competition. There was a competition department, with a competition committee. This committee was located at Dayton. It had entire supervision of competition. It had executives who dealt with competition in the field, known as "company salesmen." They worked in conjunction with sales agents and salesmen, and when in the field were under the district managers. The nexus between the competition department and the president and general manager was the executive secretary. Besides these, there was a sales manager and assistant sales manager located at New York. They had more or less to do with competition. The district managers at times held conventions at Dayton. They were attended by the president and general manager, the members of the competition committee, the executive secretary, and the company salesmen. At these conventions the subject of competition was given prominence. The sales agents and salesmen at times held conventions in different parts of the country, and at these conventions competition was a subject of discussion. Some of these officers and agents—at least the president and general manager, competition committee, and district managers—took part in framing the policy of the company as to competition. And it would seem that most, if not all, of them knew of it and had a hand in carrying it out. The sales agents and salesmen were paid a commission on their sales. All the others received salaries.

All but three of the plaintiffs in error were connected with the National Company when the indictment was found, and most of them were connected in one or the other of the capacities above set forth, and had been so for some time. The plaintiff in error John H. Patterson was president; Edward A. Deeds, vice president and a director, and possibly assistant general manager; William F. Bippus, treasurer and a director; Alfred A. Thomas, general counsel and a director; Robert Patterson, a director; Thomas J. Watson, sales manager; Joseph E. Rogers, assistant sales manager; Alexander C. Harned, executive secretary; Alexander W. Sinclair and John E. Range, company salesmen; and Frederick S. High, Pliny Eves, Arthur A. Wentz, George E. Morgan, Charles T. Walmsley, Charles A. Snyder, Walter Cool, Myer N. Jacobs, Mont L. Lasley, M. G. Keith, J. C. Laird, W. C. Howe, and E. H. Epperson, district managers. It is not certain that the plaintiff in error Jonathan B. Hayward was then connected with the company; if so, it was as patent counsel. The plaintiff in error William H. Muzzy ceased his connection in 1911, and was then connected with the patent department at least as an attorney. Both Hayward and Muzzy had been members of the competition committee. And the plaintiffs in error William Pflum and Earl B. Wilson

ceased their connection in 1910; the one being general manager, and the other sales agent. John H. Patterson had been president since 1884, and all the others had been connected with the company many years, though not in the same capacities in which they were then connected, and yet most of them in capacities which caused them to have to do more or less with competition.

We think it clear that there was substantial evidence to the effect that there was a conspiracy on the part of those officers and agents of the National Company who then had to do with competition against most, if not all, of the competitors named who were in existence before the American of Columbus came into existence, which was not later than the early part of 1907, except the Peninsular, Burdick-Corbin, and Dial, as long as they were in existence within the 20-year period, and that this conspiracy included the use of some, if not all, of the means specified, and other means not specified aimed to be covered by the eleventh item, and that when that company came into existence there was a generic conspiracy against all competitors, at least all who might endanger the National's supremacy, which generic conspiracy had been in existence at least from the beginning of the 20 years. In an issue of a publication of the company seemingly for distribution amongst its officers and agents, of date May 1, 1892, occur these statements:

"If the opposition knew what is in store for them, they would not waste any more time and money staying in the business. They are all beginning to realize that there is no hope for them."

"It is only a question of whether we propose to spend the money to keep down opposition. If we continue, it is absolutely certain no opposition company can stand against this company and its agents. If necessary, we will spend five times as much money as we have already done, in order to down opposition. If they really believe this, they will throw up the sponge and quit."

"We are receiving overtures to buy out opposition. We will not buy them out. We do not buy out; we knock out."

In an issue August 1, 1895, occurs this statement:

"We are determined to absolutely control the cash register business."

And in an issue of date March 25, 1897, after setting forth the policy of the company of frankly informing a competitor of the purpose to drive him out of business, occurs this statement:

"This, it is true, is what is called 'securing a monopoly'; but we think there can be no possible economic or other objection to it. Cash registers are not a necessity of life. Any one who chooses can do business without them, thus contributing nothing to the 'monopoly.'"

It is then stated that "this monopoly" "is managed upon a liberal and broad-minded plan." And at a convention of the district managers held at Dayton July 22, 1907, the defendant John H. Patterson, president, thus expressed himself to them:

"We want Mr. Anderson of the competition department to give you a little idea of how we are going to control competition. We want Mr. Hayward also to give you a little talk. We want Mr. Muzzy to tell you how we are going to absolutely control the competition of the world, because we want you to feel this way. The first thing we aim to do is to keep down competition."

And again:

"I asked the Standard Oil.Company what was the secret of their success, and they said this question could be answered in a very few words. Men, nothing but men; men well organized; they will keep down competition and make things succeed."

In the publications of the company and in the communications between the officers and agents having to do with competition, terms of warfare were not infrequently used, such as battle, fight, enemy, ammunition, shot, whipped, victory, and flags flying. During that time all the competitors named then in existence retired from the field. The American of Philadelphia, Boston, Hallwood, International, Hubinger & Carroll, and Latimer quit. The National does not seem to have been the cause of the Latimer quitting. The Century, Chicago, Cuckoo, Globe, Ideal, Kruse, Lamson, Metropolitan, Navy, Osborn, Standard, Simplex, Sun, Toledo, Union, and Weller sold out to the National, and it discontinued their business. The American of Philadelphia and Boston quit because of infringement suits brought against them by the National, in which it was successful. The decisions in its favor against them are National Cash Register Co. v. American Cash Register Co. (C. C.) 47 Fed. 212; National Cash Register Co. v. American Cash Register Co., 53 Fed. 367, 3 C. C. A. 559; National Cash Register Co. v. Boston Cash I. & R. Co., 159 U. S. 261, 15 Sup. Ct. 1041, 40 L. Ed. 142. The result of this litigation may possibly have had something to do with other competitors quitting or selling out. Infringement suits were brought against most, if not all, the others, and these suits had more or less to do with their quitting or selling out. There was evidence tending to show in some of these instances at least that the claim of infringement was unfounded and known to be so, and that the suits for infringement were not brought in good faith, but for the sole purpose of aiding in driving the competitors from the field. The government claims that such was the case in all instances. In most, if not all, of these instances, some, if not all, of the other means were resorted to, and it is not unlikely that in some instances at least they were more effective than the suits. And such means were resorted to in some, if not all, the cases where the suits were successful. The Hallwood, International, Century, Chicago, Cuckoo, Globe, Ideal, Metropolitan, Navy, Osborn, Simplex, Sun, Toledo, Union, and Western retired from the field during the 7 years prior to 1907. Most, if not all, of the others retired before then, and mainly in the early part of the 20-year period.

In justice to the National Company and the defendants it should be noted that it was the pioneer in the cash register business and developed it. It owned the basic patents and must have acquired in a proper manner a very great number of improvement patents. In addition to this, it had the advantage of very great capacity in the management of its affairs. These two considerations together, without reference to any unfair treatment of its competitors, are sufficient in themselves to account in a large measure for the success it has attained. And it is not unlikely that its trade was pirated by other competitors besides the American of Philadelphia and the Boston, against whom it obtained

decrees of infringement, and that these, as well as others, in their competition with it, resorted to some of the tactics complained of here.

We think it clear, also, that there was substantial evidence to the effect that this generic conspiracy was directed against the American of Columbus when it came into existence, and became specific as to it, and that it continued up until just shortly before the beginning of the 3-year period. The only other competitors then in existence were the Peninsular, Burdick-Corbin, and Dial, neither of which, as stated, was of much consequence. That company was the successor of the International, and it in turn of the Hallwood. The Hallwood during its existence, which covered a number of years, was one of the National's most stubborn competitors. It went into the hands of a receiver in 1903 or 1904. There was evidence tending to show that an effort was made, whilst its assets were in such hands, by the National, to acquire them without its being known in the transaction. The International acquired them, and then the American. Its connection with the Hallwood not unlikely aided it in getting established in business soon after entering the field. So identified with the Hallwood was it that its machines were frequently called Hallwood, and it, sometimes, the Hallwood Company. In view of its connection with the Hallwood Company, one would expect the generic conspiracy to be directed against it as soon as it came into existence, and so the government's evidence tended to show. May 4, 1907, the district manager at Detroit, Henry F. James, wrote to the assistant head of the competition department, Joseph E. Warren, that the Hallwood (i. e., American) situation in Detroit looked rather serious, and suggested the employment of the plaintiff in error Alexander W. Sinclair, then off the roll, to hire the Hallwood agent at that point. Warren answered that the competition did not warrant placing Sinclair on the roll again, and suggested that he (James) was in a better position to hire the agent than Sinclair. There was no evidence of anything else of a specific character during this year. But there were general statements as to competition which could not have had reference to any one but the American. Such was the statement of plaintiff in error John H. Patterson, at the convention of district managers July 22, 1907. June 20, 1907, the general manager, Hugh Chalmers, wrote to all the sales agents and salesmen, suggesting that they call on the users of competing machines and point out to them the weaknesses and deficiencies thereof, so that, even if they could not make a trade, they would cease to be a "plugger" for the opposition. And September 6, 1907, the head of the competition department, C. D. Anderson, wrote James at Detroit that the company was never in better shape to take care of competition than at that time, and for that reason they did not intend to let it increase again.

March 1, 1908, the plaintiff in error Sinclair entered the employ of the American and located at Detroit. It is possible that he was then still off the National's roll. He continued in its employ there until September 24, 1908. During this time a vigorous effort was made to drive him from the field, and it finally succeeded, when he re-entered the National's employ as a company salesman, and so continued until

the trial. The plaintiffs in error Pflum, then general manager, Harned, then executive secretary, and Watson, then sales manager, participated in this effort. The method of attack was to prevent him from making sales of American machines and to displace such as he made. The way in which the former was attempted was by offering Hallwoods owned by the National Company at low prices—i. e., 30 cents on the dollar—in competition. The intention was to construct a machine specially for that purpose. In letter from James to Harned of date March 16, 1908, he stated that he needed a proper tool with which to fight Sinclair's competition, and requested that 10 or 12 Hallwoods be sent him, "as our machine parallel to Hallwood will not be ready for some time," and Harned in his answer said that work on drawer-operated machine—which was the character of the American—was being pushed and they would be able to give it to him sooner than he had stated. But whether this machine was used in this connection does not appear. The way in which the displacements were brought about was by offering the regular National machines on unusual terms. Both methods were unfair. Their purpose was to drive Sinclair and the American which he represented off the field, so that the National might have it to itself. May 16, 1908, Harned wrote James, congratulating him on displacing six Hallwoods taken in part pay for six Nationals, and stated that all at the factory, including plaintiff in error Deeds, were pleased and gratified at the outcome, and that he had put a crimp in Sinclair from which he would have difficulty in recovery. June 9, 1908, James wrote Pflum that since Sinclair had taken hold he had blocked 25 of his sales and displaced 9. September 4, 1908, plaintiff in error Watson issued a circular to the selling force empowering them to sell Hallwoods at 30 cents on the dollar. There was evidence of unfair means being used during this same time at Los Angeles to prevent the sale of the American machine, the details of which need not be given. And September 10, 1908, James, in whose territory Grand Rapids, Mich., was located, wrote plaintiff in error Watson, wanting to know the conclusion of himself and plaintiff in error Pflum as to the situation at that place, and whether they had succeeded in hiring Cleaves, the agent of the American, and saying that, if they could not hire him, they should have some special men—i. e., company salesmen—there until they ran him out of business.

After Sinclair returned to the service of the National, he was sent to Toledo, Ohio, where he remained at least until in November, 1908. Whilst there he adopted the same tactics that had been used against him in Detroit to drive out the agents of the American at that point. Finally, in the middle of January, 1909, James, the district manager at Detroit left the service of the National, and in breach of a contract that he had with it at once entered the employ of the American and was placed in charge of several states, with headquarters at Detroit. In the early part of February, 1909, certainly not as late as the 22d of that month, the new district manager appointed to take the place of James at Detroit was installed. At a meeting of the sales agents and salesmen who were to be under him, held on that occasion, the plaintiff in error Watson was present and undertook to outline the policy

of the National in meeting competition, and in the course of his remarks, according to one witness, he said that it would be necessary to use every means possible to put James out of business, and according to another that they did not want him to get a foothold in Detroit, and that they would move their executive offices to Detroit, but that they would put him out of business.

Thus it is that the government's evidence tended to establish a conspiracy on the part of some of the defendants at least against the American, and brought it down almost to the door of the 3-year period. It remains to consider whether there was substantial evidence to the effect that it entered that door. Possibly in view of the fact that the American was still actively in business—that what had transpired preceding the 3 years down almost to it indicated an absolute and fixed purpose to restrain the trade of the American, if not to drive it out of business, without any indication of a change of purpose before the 3 years—and that the American was represented at Detroit by the National's former representative, against whom it had a grievance, it was for the jury, without more, to determine whether the conspiracy continued into the 3 years. But the case does not depend upon presumptions. Things were done within the 3 years by representatives of the National in restraint of the American's trade and commerce. According to the defendants, all that was done was by sales agents and salesmen, and none of the plaintiffs in error were directly connected with it; and what was done by sales agents and salesmen was scanty, in view of the fact that the National had 750 of such representatives distributed throughout the country, and the American was doing business all over it. They urge that what the government's evidence established was done should be taken as being all that was done. The American knew of all unfriendly action towards it, and actively assisted it in the prosecution of the case, and the evidence disclosed that it made a very thorough investigation. Here, according to defendants, was all that was done. In 22 instances sales agents and salesmen of the National attempted to induce purchasers of American machines, who had not paid for them, to repudiate their contracts by seller's talk and offering to allow them what they had paid on the purchase price of Nationals, in two, and possibly three, of which instances the attempt was successful. They occurred in 14 different states and 17 different localities. Ten of them occurred in 1909, 7 in 1910, and 5 in 1911. Defendants would have it that these were all such instances, but the tendency of the testimony of Steubenrauch is to establish 8 others, 6 of which were in 1910 and 2 in 1912, in Connecticut. In addition to these the acts in restraint covered by the government's evidence were the display in March, 1909, by the National's sales agents at Los Angeles, in California, in his show window, smashed-up Hallwood cash registers with a card bearing this inscription:

"Hundreds of merchants have exchanged unsatisfactory Hallwood cash registers for Nationals. We sell them at 30 cents on the dollar. But as they have no commercial value and do not sell, we are compelled to break them up to make room and will sell as Old Junk"

—an unsuccessful attempt by the sales agent of the National at Dallas, Tex., in the winter of 1909–10 to bribe a drayman in the employ

of the American agent to tell him where he delivered every American machine, and an unsuccessful attempt by the sales agent of the National at Los Angeles, Cal., May 1, 1910, to induce the American agent at that point to leave its employ and enter that of the National. The defendants contend that it is more reasonable to account for these acts by a desire on the part of the sales agents and salesmen to make commissions than the existence of the conspiracy charged. Undoubtedly these acts are small in number compared with the number which might have been, and it is possible to account for them on the grounds suggested. And the fact that James, the most important witness for the government, did not definitely testify to any specific acts in restraint of his trade after he became connected with the American is favorable to the defendant's position. But even on the basis that the foregoing list exhausts all acts in restraint of the trade and commerce of the American within the 3 years, and that these are to be accounted for, as defendants would have it, or as mere sequelæ of a conspiracy that terminated before the beginning of the 3 years, still we are constrained to hold that it was for the jury to determine whether the conspiracy continued into the 3 years. We have shown that the government's evidence tends to establish the continuance of the conspiracy almost up to the very beginning of the 3 years. Something happened shortly after the beginning of the 3 years calculated to terminate the conspiracy, which may account for nothing being done by the defendants in error within the 3 years indicating the continued existence of the conspiracy, and which, if it was the cause of its termination, involves its continuance into the 3 years. That was action on the part of James to call the National to account for its attitude towards and action against the American. On July 14, 1909, an information in the nature of a quo warranto on behalf of the people on relation of James was filed in the Supreme Court of Michigan against the National Company to oust it from that state for violating its antitrust laws, which proceeding resulted in a judgment for a fine on July 14, 1914. In the nature of things, some time must have been taken to prepare for the proceeding, and the evidence disclosed that James caused affidavits to be taken of unfair acts towards the American by National agents as far back as in March, 1909. It is not unlikely that the National became aware of this contemplated proceeding, and knowledge of it was calculated to cause it to take steps to end all action against the American which could reasonably be complained of. And we find that on April 1, 1909, the plaintiff in error Pflum sent the following letter to all the district managers, to wit:

"The National Cash Register Company.

"New York, April 1, 1909.

"To All District Managers:

"Mr. M. N. Jacobs: In the various conventions I have attended, I found that some of the newer members in the districts are not thoroughly clear on the best way to handle sales made by other companies. Please see that every agent in your district thoroughly understands our position in the matter.

"You know what this policy is, but in brief will say that in no case will we permit any of our agents to misrepresent cash registers manufactured by other companies, neither will we permit any agent or person in our employ to induce any purchaser of a cash register made by any other company to break

his contract and return the register to the manufacturer. With the line of registers that our agents now have, they are able to show the superiority of Nationals over those of any other make and at lower prices.

"There has been no violation of our policies that I know of, but I give you this information because of the inquiries received from the newer men in the field.

"Please see that these instructions are carried out in every detail and that the new men are so instructed on entering the field.

"Yours very truly,                                                Wm. Pflum,
"W. P.—T.                                      Vice President and Manager."

There is room to claim that such is the only reasonable ground to account for this letter being written and sent out. If so, there is room to claim, further, that the conspiracy continued at least until then.

[31] But we would not be understood as holding that, apart from this construction, the acts in restraint of the American's trade within the 3 years above given were not sufficient, in connection with the evidence tending to trace the existence of the conspiracy up to the beginning of the 3 years, to require that the question as to its continuance within the 3 years be submitted to the jury. The question is not whether those acts were sufficient to establish the entering into a conspiracy in the first instance, but the continuance of a conspiracy theretofore formed. And that list cannot be said to be exhaustive. We have heretofore noted that James in his letter to Harned of March 16, 1908, and Harned in his answer, referred to a drawer-operated machine parallel to the Hallwood (i. e., American), which the National was making for the purpose of fighting the American therewith. The government's evidence tended to show that a machine known as 1,000-line machine, and which not unlikely was this machine, was used only for the purpose of fighting the American and keeping it from making sales within the 3 years. If so, this could hardly be without some of the defendants being connected with it. The government's position here was combated strongly by the defendants, but we cannot weigh its evidence on this point as against that of the government. For these reasons, therefore, we think the case was for the jury, and the court did not err in overruling all the motions. It is not the province of an appellate court to weigh the evidence. What the trial court might do on a motion for new trial as to some of the defendants, in the view which we have taken of the nature of the offense charged, we need not pause to consider.

4. It is now in order to take up the assignments questioning rulings upon the admissibility of evidence. They are very numerous, but the consideration of them can be shortened by classification. In considering them, the case for the jury, as we have determined it to have been, should be kept constantly in mind. That case is whether within the three years the defendants conspired in restraint of the trade of the American of Columbus, by the use of the fifth and ninth means. No evidence that was not relevant thereto was admissible, and all that was was admissible, if not otherwise objectionable. The primary classification of these rulings is into those involving evidence that was admitted and those where the evidence was excluded. We consider first those where the evidence was admitted. In this connection it may be said generally that the admissible evidence was not confined

to that which bore directly upon the existence of such conspiracy within the 3 years. All that was not otherwise objectionable tending to show the existence of a generic conspiracy when that company came into existence and its fixed and absolute character was relevant and admissible. Likewise as to all evidence tending to show that upon its coming into existence the generic conspiracy was directed against it specifically and continued down to the beginning of the 3 years.

The admitted evidence involved in the rulings covered by the assignments relates to transactions within the 3 years and to transactions prior thereto as far back as the beginning of the 20 years. Here we consider first that which relates to transactions within the 3 years. And that may be divided into the evidence of the acts in restraint of the American trade, heretofore referred to, evidence of an act against that company, not heretofore referred to, and evidence of acts against the Michigan and Dial companies.

[32] All of the evidence of acts against the American, heretofore referred to, was objected to, and the rulings admitting it are assigned as error. It is urged that none of those acts come within the means specified in the indictment, and that the eleventh item is insufficient, under the authority of the case of United States v. Greene (D. C.) 115 Fed. 343, 346. We think, however, that they fairly come within the fifth and ninth. Greater stress is made on the consideration that it was not shown that any of the defendants were connected with any of those acts. It is true that there was no direct evidence of such connection, apart from the use of the 1,000-line machines; but this circumstance did not render evidence of those acts inadmissible. The government would base its admissibility on the doctrine of respondeat superior. It cites the cases of United States v. Gooding, 12 Wheat. 460, 6 L. Ed. 693, Cliquot's Champagne, 3 Wall. 114, 18 L. Ed. 116, and Stockwell v. United States, 13 Wall. 531, 20 L. Ed. 491, where it was held that:

"Whatever is done by an agent in reference to the business in which he is at the time employed and within the scope of this authority is said or done by the principal, and may be proved as well in a criminal as in a civil case in all respects as if the principal were the actor."

But this doctrine can have no application here, as the persons who did the acts—i. e., sales agents and salesmen—were not the agents of the defendants. They were the agents of the National Company. They were under defendants, but this did not make them defendants' agents. It urges further that they were co-conspirators with defendants, and under the case of Clune v. United States, 159 U. S. 590, 16 Sup. Ct. 125, 40 L. Ed. 269, what one conspirator does is evidence against the other, even though he is not a defendant or charged with being a party to the conspiracy in the indictment. Possibly this is sufficient to uphold the action of the court in admitting the evidence. But it is not necessary to rely on it. All the acts were done in the regular course of the business of the National Company. Those sales agents and salesmen were under the direct supervision of some, at least, of the defendants. There was substantial evidence that

prior to the 3 years the defendants were in a conspiracy to restrain the trade and commerce of the American of Columbus by causing such acts to be done, and the sole question was whether that conspiracy had continued into the 3 years. The doing of those acts was relevant to that issue. It was not an unreasonable inference that they were to be accounted for by the continued existence of the conspiracy. Possibly they are to be accounted for by the initiative of the sales agents and salesmen in their anxiety to make commissions' or as mere sequelæ. But it was for the jury to determine how they were to be accounted for as between those three possible ways of doing so. The defendants contend that is a case of an inference upon or from an inference, and that this is not allowable under the cases of United States v. Ross, 92 U. S. 281, 23 L. Ed. 707, and Manning v. Insurance Co., 100 U. S. 693, 25 L. Ed. 761. That it is a case of an inference upon or from an inference is attempted to be made out by tracing the course of inference in this way. An inference is first drawn that the sales agents and salesmen acted upon the instructions of the National Company, and then the further inference is drawn that defendants were connected with such instructions. This case does not involve any such question. It is a case of immediate inference. The course of inference is not as claimed, but from the acts done to the conspiracy as the cause thereof. The court, therefore, did not err in admitting the evidence.

[33] The evidence of an act against the company not heretofore referred to was as to something that happened in connection with one of the attempts on the part of the National's sales agents and salesmen to induce purchasers of American machines to repudiate their contracts of purchase, to wit, the attempt as to Conrad Green & Sons of Portland, Oregon, in the latter part of 1910. The agent of the American, who made that sale, left its employ the latter part of March, 1911, and entered that of the National. Evidence was admitted that after the delivery of the machine it was noticed to be out of order. The American agent made repeated attempts to fix it, but it remained out of order until he quit its employ. After he left, his successor, a repairman, who with the agent had examined the machine before its delivery and found it to be in perfect condition, examined it again and found that it was out of order because a piece of its mechanism was bent. The government's position was that the American agent had bent it, at the National's instance. There was no other evidence that the National had any other connection with the matter than that the American agent entered its employ four or five months afterwards and one of its competition men was seen in his store about three weeks before he did so. We do not think the evidence was sufficient to connect any National agent with the defective condition of the machine. There was no evidence of any other such act having ever been committed or attempted against the American. We, therefore, hold that there was error here.

[34, 35] The acts against the Michigan and Dial, evidence of which was admitted, were these. A salesman of the National attempted to induce a dealer in Michigan cash registers, who bought them out-

right from the Michigan Company and resold them, to discontinue the business by threats of interference. A similar transaction to this took place prior to the three years, i. e., in 1908. As to the Dial in one instance an agent of the National happening in the office of that company when an acquaintance was there negotiating for some of its stock advised him not to buy it; and in another the plaintiff in error Muzzy attempted to purchase the business or patents of the company which was unsuccessful. We think the court erred in admitting this evidence. The government does not contend that the evidence as to the Dial was sufficient to make a case for the jury of conspiracy against it and we have held that that as to the Michigan was not sufficient for that purpose. If this evidence did not tend to establish a conspiracy against those companies, it did not tend to establish one against the American.

[36] We come now to the evidence as to transactions prior to the three years as far back as the beginning of the twenty years which was admitted over defendants' objection and the rulings as to which are assigned as error. The bulk of the evidence relates to such transactions and most of it was objected to. If the admission of any of the evidence as to acts against the American prior to the three years which, we have theretofore stated, is assigned as error, the assignment has escaped us. The admission of the evidence as to the other act against the Michigan is assigned as error. This assignment is well taken for the reason given as to the act within the three years. The rest of the assignments here have to do with evidence tending to show a conspiracy against the competitors who ceased to exist prior to 1907 and a generic conspiracy which was directed against them. The same objections are made to some of this evidence which were made to the evidence of the acts against the American within the three years heretofore set forth. It is urged that the transactions to which it relates do not come within the means specified and the eleventh item is not sufficient to warrant evidence of them under the Greene Case. And the defendants were not shown to be connected with or responsible for them. It is also urged as to the evidence relating to transactions and matters occurring in the early part of the twenty years that they were too remote. We think, however, that none of it was too remote. It as well as the evidence of later transactions and matters tended to show a generic conspiracy and bore on its fixed and absolute character and on its nature otherwise. As to defendants' connection therewith they all occurred in the regular course of the business of the national and whether any of the defendants and which of them were connected therewith was open to inference to be drawn by the jury.

[37] Nor do we think the objection to certain of this evidence that it did not relate to transactions coming within the means specified well taken. The ruling of the court in refusing to require a bill of particulars of the means intended to be covered cannot be questioned here and the indictment was quite liberal in the matter of specification. Besides the case for which the defendants were subject to conviction was limited to means specified, to wit, fifth and ninth. The

question here is whether in establishing the generic conspiracy—a fact relevant to the existence of the specific conspiracy covered by that case—the government was limited to the means specified as to competitors who ceased their existence prior to 1907. The tendency of the use of other means than those specified was to establish that the generic conspiracy was to use every possible wrongful means that might be effective in putting an end to competition.

[38] Special emphasis is made upon the assignments which call in question rulings admitting evidence concerning the purchase of the businesses of 16 competitors by the National prior to 1907, and how the purchases came about. But all this evidence was admissible. Its tendency was to establish a generic conspiracy to compel competitors to sell out to the National by the use of any effective wrongful means in existence when the American came in the field, and the tendency of such generic conspiracy is to establish a specific conspiracy against the American when it came into existence, which continued into the 3 years, at least to restrain its trade and commerce, if not to compel it to sell out to the National, by the use of the fifth and ninth items. It is true that, at the time of these purchases, suits for infringement were pending against most, if not all, of these competitors. If such suits were brought in good faith and were the cause of the competitors selling out, then the tendency of that evidence was not to establish such a generic conspiracy. The case of Virtue v. Creamery Packing Company, 227 U. S. 8, 33 Sup. Ct. 202, 57 L. Ed. 393, was an action for treble damages under the seventh section of the Anti-Trust Act for a conspiracy in restraint of the plaintiff's interstate trade by prosecuting suits against them for infringement of patents and circulating reports that his articles were an infringement thereof. Two suits for infringement had been brought, in one of which infringement was denied and in the other decreed. In connecton with those suits such reports were circulated. It was held that no recovery could be had. Mr. Justice McKenna said:

"Patents would be of little value if infringers of them could not be notified of the consequences of infringement or proceeded against in the courts. Such action considered by itself cannot be said to be illegal. Patent rights, it is true, may be asserted in malicious prosecutions as other rights * * * may be. But this is not an action for malicious prosecution. It is an action under the Sherman Anti-Trust Act for the violations * * * of that act, seeking treble damages."

He did not mean by that that no recovery could be had under that act for damages caused by a conspiracy in restraint of interstate trade by the malicious prosecution of suits for infringement. He meant no more than that it did not appear that there was any such conspiracy in that case. So far as appeared, both suits were brought in good faith.

But here there was evidence tending to show that suits were not brought in good faith, and, on the contrary, were an "illicit use of the courts as instrumentalities of oppression," condemned in the case of Commercial Acetylene Co. v. Avery Portable Light Co. (C. C.) 152 Fed. 642. Besides, there was evidence tending to show in certain of the cases, at least, that the bringing of the suit was not

the real cause of the competitors selling out, but the use of other wrongful means.· In addition to this, in each case of purchase it was made a provision in the contract that the competitor should not engage in the cash register business for 20 or 25 years, except one or two states in the West, where the cash register .business was not large, which evidenced the purpose to keep competitors out of the business. This circumstance made what is known as the Leland contract, settling litigation growing out of the suit against the Boston Company, in which the National was successful, admissible in evidence. After the end of that suit the National brought suits against certain officers of the Boston to recover damages. In the case of National Cash Register Co. v. Leland, 94 Fed. 502, 37 C. C. A. 372, it was held that it was entitled to recover, and this is the litigation in settlement of which the contract referred to was executed. By it the National acquired patents, models, and certain apparatus of the Boston Company. It contained a provision by which the officers were not to engage in the cash register business for 25 years, except in Montana and Idaho.· There was no error in admitting any of these contracts in evidence.

[39] The admission of contracts with others than the competitors named in the indictment, eliminating them from the cash register field, is also assigned as error. There were five or six instances of this kind. The parties with whom the contracts were made were mainly dealers in second-hand registers. They evidence a purpose to acquire complete control of the business in second-hand registers of its make, and were admissible as tending to show a generic conspiracy and its character, notwithstanding they were not referred to in the indictment.

[40] The ground of objection to the evidence thus far considered is at bottom want of relevancy. Except to the extent stated we have found it to be relevant. In addition to these portions of the evidence, the admission of certain other evidence is assigned as error on the ground of its being hearsay. It is evidence as to what took place at two conventions of district managers held at Dayton, one in December, 1902, and the other in July, 1907. We have made use of what was said by the defendant John H. Patterson at the last of the two. What took place at these conventions was evidenced· by what purported to be minutes thereof. Those of the first convention were identified by a witness who had been assistant to the head of the competition department and was present at it. He further testified that ·the minutes were taken by stenographers, amongst whom was the plaintiff in error Harned, who took most of them, and that he thought a copy was sent to each district manager, and several were kept in the competition department. Those of the last ·one were identified by the former district manager at Detroit. He testified that they were sent to him by the National Company with his name on it. It is not clear whether he is to be understood as testifying that he was present at the convention. Two objections are made to that evidence. One is that both were copies, and the originals should have been produced or accounted for. The other is that the evidence of what took place at those conventions was hearsay. The first ob-

jection was not made in the lower court. That raised by the other was that before the minutes were read in evidence their accuracy should have been guaranteed, either by the persons who made them or by others who were present at the conventions. Strictly speaking, the objection that the evidence was hearsay raised this question. But the objection should have been more specific. It should have been expressly urged that such guaranty should be made before admitting the minutes in evidence. It might have been furnished. Because of this, if any error was committed in admitting these minutes in evidence, it cannot be considered.

[41, 42] This brings us to the assignments questioning rulings excluding evidence offered by the defendants. That mainly complained of is the rejection of evidence offered to prove that the National owned unexpired patents covering the machines made and sold or offered to be sold, by the 16 competitors whom it bought out, by the Hallwood, International, and Hubinger & Carroll, which quit business, and by the American of Columbus, during the times they were in existence, which machines, therefore, infringed those patents. According to this offer, all the competitors who ceased business prior to 1907, and the American of Columbus, against whose trade and commerce defendants are charged with conspiring, were infringers of the National's patents, and in so conspiring they were but seeking to prevent them from doing that which the National had a right to have them refrain from doing. We are not much impressed with the good faith of the offer as to the American. The conduct of the National and its managing officers during the five years of its existence preceding the indictment seems to belie it. During that time no suit for infringement was brought against that company, except the one heretofore referred to, and there is no indication that they then thought that it was liable to such suit. It is not likely that they would have remained quiescent in this regard, if they so thought. Because of the absence of any evidence to this effect, we have held that the conspiracy as to that company, if there was one, did not include the sixth and seventh means. But, assuming that the offer was made in good faith, we think the court was right in excluding the evidence. It could not have been admissible to meet a charge that it had in bad faith threatened to bring suits for infringement. There was no such charge to meet. The only possible ground for its admissibility was to make good that defendants had the right to conspire in restraint of the interstate trade and commerce in cash registers of the American by the use of the fifth and ninth means, and hence were not guilty of an offense under first section of the Anti-Trust Act in so doing.

This brings before us the question whether a patentee and another, or the officers and agents of a patentee, can conspire in restraint of the interstate trade or commerce in the article covered by the patent of persons who have no right to engage in such trade and commerce, and who by engaging therein infringe the right of the patentee; i. e., whether such a conspiracy comes within that section. Its disposition involves the rights of a patentee. These rights are two, one statutory,

and the other at common law. The statutory right is usually stated in its adjective form; i. e., to exclude or to prevent others from making, using, or selling the article covered by the patent, or, in other words, to sue or to bring actions against others who are or have been making, using, or selling them. But this right has also a substantive form. It is that others shall refrain from making, or using, or selling the article. The patentee's right at common law is to make, use, or sell the article. This right is to no extent dependent on the statute. The patentee, therefore, has the right to have others refrain from selling the article covered by his patent, and if they will not do so he has the right to prevent them from selling by suit. Has a patentee, then, the right to prevent any infringer from selling the article covered by his patent in any other way? He certainly has no right to do it by killing him, or destroying his factory, or such infringing articles as he may own. In selling the infringing article, no assaults are made upon his person, so that there is no room for claiming that his action was in self-defense. And the infringer owns his factory and articles. The patentee may be entitled to a destruction of the infringing articles through the process of the court, but not otherwise. But has he the right to prevent him from so doing by action outside of the courts, not involving an invasion of the rights of person or property of the infringer; i. e., by the use of means which would be wrongful if used by him to prevent another from selling articles not covered by his patent—i. e., such means as are charged here.

We are not concerned here with the question as to what a patentee may himself do in a general way to protect the substantive right which he has from invasion. The question in hand is whether he and another, or his officers and agents in his interest, may conspire to prevent an invasion of his rights in the interstate field by the use of any such means. This depends solely on whether such a conspiracy is within the first section of the Anti-Trust Act. And it would seem that to ask this question is to answer it. The terms of the section are of a most sweeping character. It includes every conspiracy in restraint of interstate trade or commerce. It is not a question whether it is rightful or wrongful interstate trade or commerce that is covered by the conspiracy. It is sufficient that it is interstate trade or commerce. If two or more persons in no way interested in a patent were to conspire in restraint of the interstate trade or commerce of an infringer, no one would contend that the conspiracy was not covered by the statute. No more is it open to contend that a conspiracy by a patentee and another, or by the officers and agents of a patentee in his interest, to restrain the interstate trade or commerce of an infringer, is not within the statute. The intent of the statute was to sweep away all conspiracies in restraint of such trade or commerce, whatever their character may be. The statute respects the monopoly of the patentee. It to no extent invades the rights conferred upon him by his patent. Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058; United States v. Winslow, 227 U. S. 202, 33 Sup. Ct. 253, 57 L. Ed. 481. But the right to conspire with

ancther or others in his interest in restraint of the interstate trade or commerce covered by his patent is not one of the rights conferred thereby, and such a conspiracy is within the statute. Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 33 Sup. Ct. 9, 57 L. Ed. 107. Mr. Justice McKenna there said:

"Rights conferred by patents are indeed very definite and extensive, but they do not give any more than other rights a universal license against positive prohibitions. The Sherman Law is a limitation of rights—rights which may be pushed to evil consequences, and therefore restrained."

We are therefore clearly of the opinion that the defendants were not entitled to offer evidence that the trade and commerce of the American of Columbus in cash registers was covered by an unexpired patent owned by the National.

[43] How, then, as to the competitors who ceased to exist prior to 1907, and who either sold out to the National or just quit doing business? Was evidence that their trade and commerce was covered by unexpired patents so owned admissible? We think it was. As to them the question before the jury was not whether the defendants had the right to conspire in restraint of their interstate trade or commerce. The defendants were not on trial for any such conspiracy. The right to prosecute them for such conspiracy had been long before barred by the statute of limitations. But the question was before the jury whether they had conspired against those competitors to restrain their interstate trade or commerce by threatening to bring and bringing in bad faith suits against them for infringement of patents to compel them to sell out to the National or quit the business. It was the position of the government that they had so conspired, and there was evidence tending to establish that they had, at least as to some of them. This was not an ultimate question in the case. It was only a subordinate one, and yet it was a real one. It was not primarily subordinate to the question whether the defendants had conspired in restraint of the interstate trade or commerce of the American of Columbus by the use of such means. As we have seen, there was no such question in the case. It was primarily subordinate to the question whether, prior to 1907, when the American came into existence, the defendants were parties to a generic conspiracy in restraint of the interstate trade or commerce of all competitors who might endanger the supremacy of the National by the use of any effective means, of which a conspiracy against the American of Columbus by the use of the fifth and ninth means, which continued into the 3 years, was the outgrowth.

Now, as bearing on that question, we think that the defendants were entitled to prove, if they could, that the machines of those competitors were infringements. The means covered by the seventh item were in effect malicious prosecutions against those competitors—the bringing of suits for infringement, not in the belief that the National had a good cause of action against them, but without regard to whether it had or not—in order to drive them from the cash register field; i. e., in bad faith or without probable cause. A suit for malicious prosecution cannot be brought until the termination of the prosecu-

tion. In such a suit, therefore, it is never a question whether there was real cause for the prosecution. Its dismissal settles the question whether there was real cause. But it is a question therein whether there was probable cause. The suit cannot be maintained if there was. But here there was no termination of the suits for infringement, by a decision of the question of infringement involved therein. In most instances the suits were terminated by settlement. The question, therefore, whether there was real cause for bringing them, is still an open question. And if there was real cause for their bringing, they were not malicious prosecutions—they were not brought in bad faith. If in an ordinary suit for malicious prosecution it is a good defense that there was probable cause for the prosecution, so here the claim that these infringement suits were brought in bad faith is met by showing that there was real cause for them, in that the competitors were infringers of valid unexpired patents held by the National. The defendants were not limited to showing that the National acted on the advice of counsel in bringing the suits. They had the right to show, if they could, that such suits were based upon valid patents against real infringers. It is true that the effect of this is to bring into this prosecution a considerable number of patent suits as it were. But the government has brought them here by charging in the indictment that defendants conspired to drive these competitors from the cash register field by maliciously bringing suits for infringements of patents against them, and introducing evidence to that effect. We think, therefore, that the evidence was admissible, and that there was error in excluding it.

[44] It is also urged that the court erred in excluding evidence of competitive tactics and aggressions on the part of the National's competitors, offered by defendants. As we make it, this evidence related only to the Hallwood, the American's predecessor, and to Steubenrauch, the American's Connecticut sales agent; the conduct of the latter happening within the 3 years. We think this evidence was admissible. The relevancy of the government's evidence as to a conspiracy against the Hallwood was in its bearing on the existence of a generic conspiracy and its character. The tendency of the evidence as to its competitive tactics and aggressions against the National was to make out that, in so far as there was a conspiracy against the Hallwood, it was due to provocation. Provocation, therefore, was a possible element in the generic conspiracy, and, if so, the fact of there having been no provocation on the part of the American, the remote successor of the Hallwood, would make it open to contend that the general conspiracy was never directed against it. It is in this way that it seems to us that the evidence as to the conduct of the Hallwood bore on the question whether there was a conspiracy against the American. Then, as to Steubenrauch's conduct: The tendency thereof was to show that the conduct of the National's sales agent complained of was due to that conduct, and not to a conspiracy on the part of defendants against the American.

[45] Finally, the exclusion of the letters of plaintiffs in error High and Snyder to the plaintiff in error Pflum, of date, respectively, April

5, 1909, and April 6, 1909, in answer to his circular letter of April 1, 1909, to the district managers, heretofore quoted in full, are assigned as error. In those letters these two plaintiffs in error stated that the policy therein outlined had been pursued in their districts. We think the letters were admissible in evidence. They were written nearly 3 years before the finding of the indictment, and were a part of the res gestæ. Hibbard v. United States, 172 Fed. 66, 70, 96 C. C. A. 554, 18 Ann. Cas. 1040; Harrison v. United States, 200 Fed. 674, 119 C. C. A. 78; Gould v. United States, 209 Fed. 730, 126 C. C. A. 454. If there was anything in the circumstances then or theretofore existing affecting their good faith, they were for the jury to consider, just as it was for them to determine the good faith of the Pflum circular.

5. It remains to consider the errors assigned in connection with the charge to the jury. But few exceptions were taken to the charge which was given, and no assignment of error in this connection has been argued. We therefore pass these exceptions by. The court submitted all three counts to the jury. The defendants requested that the jury be instructed to find them not guilty on the second and third. In accordance with our holding as to the sufficiency of these two counts, the defendants were entitled to have the jury so instructed. The first count alone should have been submitted to them.

[46] The court clearly told the jury that the defendants could not be found guilty under that count unless they had conspired within the 3 years. This, of course, limited the case upon which they could be so found to competitors in existence during the 3 years. But defendants were entitled to have the jury instructed specifically that they could not be found guilty as to the competitors who ceased to exist before 1907. They asked specific instructions to this effect. These instructions were given as to 6 of them. They should have been given as to the other 20. That such instructions were given as to 6 made it more prejudicial that they were not given as to the other 20.

[47] The defendants also requested that the jury be specifically instructed that they could not be found guilty as to each of the 6 competitors who were in existence during the 3 years. They were not entitled to the instruction as to the American of Columbus. They were entitled to the instruction as to the other 5. There was no substantial evidence that within the 5 years defendants had conspired as to either of those 5 competitors. The instructions as to the Burdick-Corbin and Jewell were given. Those also as to the Peninsular, Dial, and Michigan should have been given. The defendants further requested that the jury be specifically instructed that they could not be found guilty of having conspired within the 3 years in restraint by the use of each of the 11 means specified. They were so instructed as to the fourth. They were entitled to have it instructed also as to the sixth, seventh, eighth, ninth, and eleventh. Whilst, as we have held, the first, second, and third means were noneffective, without more, and the evidence as to the conspiracy within the 3 years including either of those means was slight yet such as it was the jury was entitled to consider in connection with that bearing on the fifth and

ninth means, and no instructions should have been given which could be construed as excluding that evidence. That it is reversible error to submit to the jury the question whether the conspiracy in question includes means of which there is no evidence follows from the decision in Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232. The grounds upon which we hold the court erred in not giving the specific instructions indicated appear in what we have had to say on defendants' right to a peremptory instruction. The giving of them would have presented sharply to the jury the only ultimate question before it, to wit, whether within the 3 years the defendants conspired in restraint of the interstate trade or commerce in cash registers of the American of Columbus by the use of the fifth and ninth means specified.

[48-50] The defendants also requested the giving of three instructions embodying certain general propositions as to what it was not unlawful for the defendants to do in their several capacities as officers and agents of the National, to wit:

(1) "To require the agents of their company to report the names of persons who had purchased cash registers from competitors, or to secure samples of machines from time to time put on the market by competitors."

(2) "To sell or offer and try to sell National cash registers to persons who had bought and owned competing cash registers in exchange at such price as was satisfactory to the parties."

(3) "To compare by comparative demonstrations or otherwise competitive cash registers with National cash registers, for the purpose of demonstrating the superiority of the National cash registers, and thereby induce the prospective purchaser to purchase the National cash register."

No objection can be made to the last proposition, but the other two were too broad. They need qualification. It was unlawful for defendants to do as stated in the second proposition, if the doing thereof involved the purchaser and owner of the competing cash register breaking his contract with the competitor in any particular, or was done for the purpose of driving the competitor out of the cash register field. One competitor has the right to try to sell by fair means all of his goods that he can, and if the effect of his selling is to drive another competitor out of the field he is not to blame. But it is wrong for one competitor to want to drive another competitor from the field by unfair or illegal means, and to take steps to that end, so that he may have the field free from such competition and thereby be enabled to sell his goods.

Then, as to reporting purchasers of competing registers and securing samples, it all depends on the manner in which the information in the one instance and the samples in the other were obtained or secured. If in a proper manner, nothing unlawful was done.

We do not deem it necessary to consider the other requests asked and refused.

We are constrained, therefore, to reverse the judgment of the lower court, and remand the case for a new trial and further proceedings consistent herewith.